**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **BABCOCK & WILCOX SOLAR HOLDINGS, LLC** | ) | CASE NO. |
| 1200 East Market Street, Suite 650 | ) | JUDGE: |
| Akron, OH 44305, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BABCOCK & WILCOX SOLAR ENERGY, INC.** | ) | **COMPLAINT** |
| 1200 East Market Street, Suite 650 | ) | |
| Akron, OH 44305, | ) | **(Jury Demand Endorsed Hereon)** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| **JAMES JACKSON** | ) | |
| 870 N. Miramar Ave. Apt. 917 | ) | |
| Indialantic, FL 32903 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **COLLIN RHODES** | ) | |
| 20 Cielo Estrellado | ) | |
| Edgewood, NM 87015, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Babcock & Wilcox Solar Holdings, LLC ("B&W Solar Holdings") and Babcock & Wilcox Solar Energy, Inc., f/k/a Fosler Construction Company Inc. ("B&W Solar Energy") (collectively, "B&W" or "Plaintiffs"), for their Complaint against Defendants James Jackson ("Jackson") and Collin Rhodes ("Rhodes") (collectively, "Defendants"), allege as follows:

1.  B&W Solar Holdings is limited liability company, organized in the state of Ohio.

2.  B&W Solar Energy is a corporation, incorporated in the state of Illinois.

3.  Plaintiffs' corporate headquarters and principal place of business are located in Ohio, at 1200 East Market Street, Suite 650, Akron, Ohio 44305.

4.  Upon information and belief, Jackson is a citizen of the state of Alabama and/or Florida.

5.  Upon information and belief, Rhodes is a citizen of the state of New Mexico.

6.  Pursuant to 28 U.S.C. § 1332(a)(1), "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000...and is between...citizens of different States."

7.  28 U.S.C. § 1332(c)(1) provides "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business...."

8.  This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states, and as described below, because the matter in controversy exceeds the sum or value of $75,000.

9.  28 U.S.C. § 1331 provides, "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

10. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law; specifically, the Plaintiffs allege Defendants misappropriated the Plaintiffs' trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, as described below.

11. Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over Plaintiffs' remaining claims for breach of contract, violations of the Ohio Uniform Trade Secrets Act pursuant to Ohio Revised Code §§ 1333.61 et seq., tortious interference with contract, tortious interference of business relationships, and civil conspiracy, because such claims are so related to Plaintiffs' claims that Defendants misappropriated trade secrets in violation of 28 U.S.C. § 1836, as to form the same case or controversy.

12. Jackson entered into a Separation and Release of Claims Agreement (the "Jackson Agreement") upon termination of employment from B&W, which must now be enforced, as described herein (attached as Exhibit A).

13. Rhodes entered into a Separation and Release of Claims Agreement (the "Rhodes Agreement") upon termination of employment from B&W, which must now be enforced, as described herein (attached as Exhibit B).

14. The Jackson Agreement and Rhodes Agreement each identified the "sole and exclusive venue for disputes involving [the] Agreement" as "the court, state or federal, having jurisdiction over Summit County, Ohio." (See Exhibits A and B, paragraph 17).

15. Venue is therefore also proper in this Court pursuant to the Jackson Agreement and Rhodes Agreement that are the subject of this controversy, as described below.

**BACKGROUND: DEFENDANTS' EMPLOYMENT WITH B&W**

16. B&W engineers, procures and constructs commercial, industrial and utility-scale solar projects.

3

17.    B&W's business relationships and information pertaining to its business operations, business partners, vendors, clients and customers have been developed over a period of years at great expense to B&W. The names, addresses, and contact information of B&W's business partners, vendors, clients and customers are examples of highly confidential information and trade secrets belonging to B&W, which is information that is not known outside of B&W. B&W has taken precautions to guard such information's secrecy and confidentiality.

18.    B&W's finances, business operations, business strategies and pricing information are also examples of highly confidential information and trade secrets of B&W, which is information that is not known outside of B&W. B&W has taken precautions to guard such information's secrecy and confidentiality.

19.    As one example of B&W's efforts to protect its confidential information and trade secrets, B&W Solar Energy required Defendants, as newly hired employees (consistent with a practice that it maintains through today), to sign and agree to comply with a Confidentiality Policy and Pledge (the "Pledge") as a condition of employment with B&W.

20.    The Pledge explicitly provided and provides for confidentiality of business information and trade secrets as follows:

**Confidentiality Policy and Pledge**

As a result of working for [B&W Solar Energy], any information that an Employee learns about the company, its members, or donors, that is not otherwise publicly available, constitutes as confidential information. Employees may not disclose confidential information to anyone who is not employed by the company, or to other company employees who do not need to know such information to assist in rendering services.

The disclosure, distribution, electronic transmission or copying of the company's confidential information is prohibited.  Any employee who discloses confidential company information will be subject to disciplinary action (including possible separation), even if he or she does not actually benefit from the disclosure of such information.

I understand the above policy and pledge not to disclose confidential information.

21.   Jackson was hired by B&W Solar Energy on or about February 21, 2022, as the Chief Operations Officer.

22.   In consideration for his employment with B&W Solar Energy, Jackson signed the Pledge on February 23, 2022 (attached as Exhibit C).

23.   Jackson's employment was transferred to B&W Solar Holdings on July 1, 2023, and Jackson retained a position as Chief Executive Officer with B&W Solar Energy.

24.   As Chief Operations Officer and later as Chief Executive Officer, Jackson was responsible for the oversight of all of B&W's operations, including the oversight and management of business operations, project development, and project execution.

25.   As Chief Operations Officer and later as Chief Executive Officer, Jackson had complete access to B&W's confidential information and trade secrets, including, but not limited to, the names, addresses, and contact information of B&W's business partners, vendors, clients, and customers, B&W's personnel information, any and all information related to B&W's project execution, including the business strategies of B&W and all details of its financial information.

26.   During Jackson's employment with B&W, Jackson was authorized to use such

confidential information and trade secrets solely to advance the business interests of B&W, and for no other purpose.

27.   Jackson was involuntarily separated from his employment with B&W and signed the Jackson Agreement with B&W on August 11, 2023.

28.   The Jackson Agreement explicitly includes a "Confidentiality/Proprietary Information and Intellectual Property" covenant, at paragraph 8.

29.   Paragraph 8 of the Jackson Agreement provides:

### Confidential/Proprietary Information and Intellectual Property

Employee understands and agrees that to the extent Employee has obligations under any Company policy, agreement and/or and[sic] procedure regarding confidential or proprietary business, trade secret, or intellectual property, that those obligations survive and continue indefinitely after Employee's termination of employment. Accordingly, consistent with Company's policies and procedures, Employee agrees not to take and to return, and to keep and maintain as confidential, and not to use or disclose to others, any confidential or proprietary business [sic][information], trade secret, or intellectual property, *including but not limited to any such information as it pertains to Company, its finances, business operations, strategy* and marketing, *and Company's business partners, customers, clients, and vendors* that Employee acquired, had access to, or was privy to during Employee's employment with Company. Employee acknowledges and agrees that any remedies at law available to Company for any breach of Employee's obligations under this Paragraph would be inadequate and agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding, without the necessity of proof of actual damages.  The rights and remedies of Company pursuant to this Paragraph are cumulative, in addition to, and shall not be deemed to exclude an other right or remedy which Company may have pursuant to this Agreement or otherwise, at law or in equity.

(see Exhibit C)(emphasis added).

30.   In consideration for Jackson entering into the Jackson Agreement with the "Confidentiality/Proprietary Information and Intellectual Property" covenant, Jackson

was paid severance in the total amount of $84,615.38.

31.    Following Jackson's separation of employment from B&W, on or around December

2023, Jackson sent several threatening and explicit email messages to B&W, requesting

additional severance pay and threatening legal action.

32.    Rhodes was hired by B&W Solar Energy on or about October 16, 2021, as the Director

of Construction–Western Region.

33.    In consideration for his employment with B&W Solar Energy, Rhodes signed the Pledge

on December 7, 2021 (attached as Exhibit D).

34.    The Pledge that Rhodes signed as a condition of his employment is described above, in

Paragraph 20 of this Complaint, as it is identical to the Pledge that Jackson signed.

35.    Rhodes's employment was transferred to B&W Solar Holdings on July 1, 2023, and

Rhodes's position was Senior Vice President and Chief Technical Officer.

36.    As B&W's Director of Construction–Western Region, Rhodes was responsible for all

construction operations in B&W's western region, and as B&W's Senior Vice President

and Chief Technical Officer, Rhodes was responsible for all the engineering operations

of B&W's business.

37.    As B&W's Director of Construction–Western Region, and as B&W's Senior Vice

President and Chief Technical Officer, Rhodes had complete access to B&W's

proprietary and confidential information, including, but not limited to, the names,

addresses, and contact information of B&W's business partners, vendors, clients, and

customers, B&W's personnel information, any and all information related to B&W's

solar business operations, including the business strategies of B&W and all details of

7

its financial information.

38. During Rhodes's employment with B&W, Rhodes was authorized to use such confidential and proprietary information solely to advance the business interests of B&W, and for no other purpose.

39. Rhodes was involuntarily separated from his employment with B&W and signed the Rhodes Agreement with B&W on December 21, 2023.

40. The Rhodes Agreement explicitly includes a "Confidentiality/Proprietary Information and Intellectual Property" covenant, at paragraph 8.

41. The "Confidentiality/Proprietary Information and Intellectual Property" covenant of the Rhodes Agreement is identical to that in the Jackson Agreement described above, in Paragraph 29 of this Complaint.

42. In consideration for Rhodes entering into the Agreement with the "Confidentiality/Proprietary Information and Intellectual Property" covenant, Rhodes was paid severance in the total amount of $34,961.54.

**BACKGROUND: THE NEW YORK LAWSUITS**

43. In April 2024, B&W learned that Jackson provided Affidavits on behalf of the plaintiffs in four separate lawsuits pending in the Supreme Court of St. Lawrence County, State of New York, captioned as: (1) The L.C. Whitford Co., Inc., et al v. Babcock & Wilcox Solar Energy, Inc. F/K/A Fosler Construction Company, Inc., Babcock & Wilcox Enterprises, Inc., et al., Case No. EFCV-24-165710; (2) Smoke River, LLC, v. Babcock & Wilcox Solar Energy, Inc., F/K/A Fosler Construction Company, Inc., et al., Case No. EFCA2024-000085; (3) The L.C. Whitford Co., Inc., v. Babcock & Wilcox Solar Energy,

Inc. F/K/A Fosler Construction Company, Inc., et al., Case No. EFCV-24-165764; and (4) The L.C. Whitford Co., Inc., et al v. Babcock & Wilcox Solar Energy, Inc. F/K/A Fosler Construction Company, Inc., et al., Case No. EFCV-24-165887  (such four lawsuits, collectively, the "New York Lawsuits") (attached as Exhibit E).

44.   In Jackson's March 27, 2024 Affidavit ("Jackson's Affidavit"), which became a public record, he revealed information related to B&W (see Exhibit E).

45.   Some of the information contained in Jackson's Affidavit was B&W's confidential information and trade secrets.

46.   Jackson disclosed the confidential information and trade secrets of B&W in Jackson's Affidavit, at minimum, to counsel for the plaintiffs in the New York Lawsuits. Those disclosures are now public record and are available for anyone to read.

47.   Upon information and belief, Jackson disclosed to counsel for the plaintiffs in the New York Lawsuits, and to other parties, such as the plaintiffs in the New York Lawsuits, confidential information and trade secrets of B&W far beyond what is contained in Jackson's Affidavit.  That confidential information and trade secrets were then whittled down into Jackson's Affidavit.

48.   Upon information and belief, Jackson knew he was disclosing confidential information and trade secrets in the process to create Jackson's Affidavit, including, but not limited to, in conversations with counsel for the plaintiffs in the New York Lawsuits.

49.   Jackson's actions in providing confidential information and trade secrets of B&W had the purpose and effect of damaging B&W, both by way of disclosure of confidential information and trade secrets not otherwise known to the public, by using this

information for his own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W because B&W separated his employment and then did not respond affirmatively to his request for additional severance pay.

50. Jackson's willful and malicious acts of providing confidential information and trade secrets of B&W to counsel for plaintiffs in the New York Lawsuit, the public, and others are improper, unlawful and carried out with actual malice and/or a reckless indifference to the rights of B&W.

51. Jackson's misconduct has directly and proximately caused damages to B&W in an amount to be determined at trial.

52. In April 2024, B&W learned that Rhodes provided an Affidavit on behalf of the plaintiffs in the New York Lawsuits (attached as Exhibit F).

53. In Rhodes's April 17, 2024 Affidavit ("Rhodes's Affidavit"), which became a public record, he revealed information related to B&W (see Exhibit F).

54. Some of the information contained in Rhodes's Affidavit was B&W's confidential information and trade secrets.

55. Rhodes disclosed the confidential information and trade secrets of B&W in Rhodes's Affidavit, at minimum, to counsel for the plaintiffs in the New York Lawsuits. Those disclosures are now public record, and are available for anyone to read.

56. Upon information and belief, Rhodes disclosed to counsel for the plaintiffs in the New York Lawsuits, and to other parties, such as the plaintiffs in the New York Lawsuits, confidential information and trade secrets of B&W far beyond what is contained in

Rhodes's Affidavit.  That confidential information and trade secrets were then whittled down into Rhodes's Affidavit.

57.    Upon information and belief, Rhodes knew he was disclosing confidential information and trade secrets in the process to create Rhodes's Affidavit, including, but not limited to, in conversations with counsel for the plaintiffs in the New York Lawsuits.

58.    Rhodes's actions in providing confidential information and trade secrets of B&W had the purpose and effect of damaging B&W, both by way of disclosure of confidential information and trade secrets not otherwise known to the public, for his own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W for separating his employment.

59.    Rhodes's willful and malicious acts of providing confidential information and trade secrets of B&W to counsel for plaintiffs in the New York Lawsuits, the public, and others are improper, unlawful and carried out with actual malice and/or a reckless indifference to the rights of B&W.

60.    Rhodes's misconduct has directly and proximately caused damages to B&W in an amount to be determined at trial.

<u>COUNT I</u>
**BREACH OF CONTRACT: DEFENDANT JACKSON**

61.    The foregoing paragraphs are incorporated by reference.

62.    The Pledge is a valid contract between B&W and Defendant Jackson, including offer, acceptance and consideration.

63.    The Jackson Agreement is a valid contract between B&W and Defendant Jackson,

including offer, acceptance and consideration.

64. B&W performed its contractual obligation under the Pledge when it hired Jackson.

65. B&W performed its contractual obligation under the Jackson Agreement when it paid Jackson severance pay.

66. Jackson breached his obligations under the Pledge and his Agreement directly, by disclosing confidential information in Jackson's Affidavit in the New York Lawsuits, without legal excuse.

67. Jackson breached his obligations under his Agreement and the Pledge directly, by disclosing confidential information in Jackson's Affidavit to the public, without legal excuse.

68. Upon information and belief, Jackson breached his obligations under his Agreement and the Pledge directly, by disclosing confidential information in discussions and conversations in the process of creating Jackson's Affidavit in the New York Lawsuits, without legal excuse.

69. Jackson's breach of the Pledge and his Agreement directly and proximately caused damages to B&W in an amount not less than $84,615.38.

70. Jackson has been unjustly enriched by virtue of the severance pay provided to him in consideration of his promises under the Pledge and his Agreement, now breached, including confidentiality of business and proprietary B&W information and trade secrets.

**COUNT II**
**BREACH OF CONTRACT: DEFENDANT RHODES**

71.    The foregoing paragraphs are incorporated by reference.

72.    The Pledge is a valid contract between B&W and Defendant Rhodes, including offer, acceptance and consideration.

73.    The Rhodes Agreement is a valid contract between B&W and Defendant Rhodes, including offer, acceptance and consideration.

74.    B&W performed its contractual obligation under the Pledge when it hired Rhodes.

75.    B&W performed its contractual obligation under the Rhodes Agreement when it paid Rhodes severance pay.

76.    Rhodes breached his obligations under his Agreement and the Pledge directly, by disclosing confidential information in Rhodes's Affidavit in the New York Lawsuits, without legal excuse.

77.    Rhodes breached his obligations under his Agreement and the Pledge directly, by disclosing confidential information in Rhodes's Affidavit to the public, without legal excuse.

78.    Upon information and belief, Rhodes breached his obligations under his Agreement and the Pledge directly, by disclosing confidential information in discussions and conversations in the process of creating Rhodes's Affidavit in the New York Lawsuits, without legal excuse.

79.    Rhodes's breach of the Pledge and his Agreement directly and proximately caused

damages to B&W in an amount not less than $34,961.54.

80.   Rhodes has been unjustly enriched by virtue of the severance pay provided to him in consideration of his promises under the Pledge and his Agreement, now breached, including confidentiality of business and proprietary B&W information and trade secrets.

**COUNT III**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**18 U.S.C. § 1836**
**DEFENDANT JACKSON**

81.   The foregoing paragraphs are incorporated by reference.

82.   By virtue of his employment and position with B&W, Jackson had access to confidential information, including, but not limited to, B&W's financial information, business operations and strategy and business partner, vendor, customer and client information, as set forth above.

83.   This confidential and proprietary information has independent and intrinsic economic value, constituting trade secrets of B&W.

84.   B&W has taken, and continues to take, reasonable precautions to preserve and protect such trade secrets from disclosure.

85.   B&W's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means, by another person.

86.   B&W's trade secrets are related to B&W's goods and services used in, and intended for use in, interstate commerce, as B&W's reach is both global and national, as its goods

and services are provided to businesses, organizations, and individuals in multiple states, and worldwide.

87. Jackson misappropriated trade secrets of B&W by disclosing confidential information in Jackson's Affidavit in the New York Lawsuits, without legal excuse, on or around March 27, 2024.

88. Jackson misappropriated trade secrets of B&W by disclosing confidential information in Jackson's Affidavit in the New York Lawsuits, to the public, without legal excuse, on or around March 27, 2024.

89. Jackson misappropriated trade secrets of B&W in the creation of Jackson's Affidavit, at minimum, to counsel for the plaintiffs in the New York Lawsuits. Those disclosures are now public record, and are available for anyone to read.

90. Jackson misappropriated trade secrets of B&W by disclosing B&W's confidential financial information, confidential internal financial processes, client information, and details regarding contractual agreements between B&W and its clients in Jackson's Affidavit (see Exhibit E).

91. Upon information and belief, Jackson misappropriated trade secrets of B&W to counsel for the plaintiffs in the New York Lawsuits, and to other parties, such as the plaintiffs in the New York Lawsuits, confidential information and trade secrets of B&W far beyond what is contained in Jackson's Affidavit.  That confidential information and trade secrets were then whittled down into Jackson's Affidavit.

92.    Upon information and belief, Jackson knew he was disclosing confidential information and trade secrets in the process to create Jackson's Affidavit, including, but not limited to, in conversations with counsel for the plaintiffs in the New York Lawsuits.

93.    Jackson's misappropriation of B&W's trade secrets was in violation of 18 U.S.C. § 1836, by using this information for his own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W because B&W separated his employment and then did not respond affirmatively to his request for additional severance pay.

94.    Jackson's misappropriation of B&W's trade secrets was willfully and maliciously misappropriated, and in bad faith.

95.    Jackson's misappropriation of B&W's trade secrets caused B&W actual damages, in an amount to be determined at trial.

**COUNT IV**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**18 U.S.C. § 1836**
**DEFENDANT RHODES**

96.    The foregoing paragraphs are incorporated by reference.

97.    By virtue of his employment and position with B&W, Rhodes had access to confidential information, including, but not limited to, B&W's financial information, business operations and strategy and business partner, vendor, customer and client information, as set forth above.

98.    This confidential and proprietary information has independent and intrinsic economic value, constituting trade secrets of B&W.

16

99.   B&W has taken, and continues to take, reasonable precautions to preserve and protect such trade secrets from disclosure.

100.  B&W's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means, by another person.

101.  B&W's trade secrets are related to B&W's goods and services used in, and intended for use in, interstate commerce, as B&W's reach is both global and national, as its goods and services are provided to businesses, organizations, and individuals in multiple states, and worldwide.

102.  Rhodes misappropriated trade secrets of B&W by disclosing confidential information in Rhodes's Affidavit in the New York Lawsuits, without legal excuse, on or around April 17, 2024.

103.  Rhodes misappropriated trade secrets of B&W by disclosing confidential information in Rhodes's Affidavit in the New York Lawsuits, to the public, without legal excuse, on or around April 17, 2024.

104.  Rhodes misappropriated trade secrets of B&W in the creation of Rhodes's Affidavit, at minimum, to counsel for the plaintiffs in the New York Lawsuits. Those disclosures are now public record, and are available for anyone to read.

105.  Rhodes misappropriated trade secrets of B&W by disclosing B&W's confidential financial information, confidential internal financial processes, client information, and details regarding contractual agreements between B&W and its clients in Rhodes's

Affidavit (see Exhibit F).

106.   Upon information and belief, Rhodes misappropriated trade secrets of B&W to counsel for the plaintiffs in the New York Lawsuits, and to other parties, such as the plaintiffs in the New York Lawsuits, confidential information and trade secrets of B&W far beyond what is contained in Rhodes's Affidavit.  That confidential information and trade secrets were then whittled down into Rhodes's Affidavit.

107.   Upon information and belief, Rhodes knew he was disclosing confidential information and trade secrets in the process to create Rhodes's Affidavit, including, but not limited to, in conversations with counsel for the plaintiffs in the New York Lawsuits.

108.   Rhodes's misappropriation of B&W's trade secrets was in violation of 18 U.S.C. § 1836, by using this information for his own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W for separating his employment.

109.   Rhodes's misappropriation of B&W's trade secrets was willfully and maliciously misappropriated, and in bad faith.

110.   Rhodes's misappropriation of B&W's trade secrets caused B&W actual damages, in an amount to be determined at trial.

## COUNT V
### VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT – OHIO REVISED CODE §§ 1333.61, ET. SEQ. DEFENDANT JACKSON

111.   The foregoing paragraphs are incorporated by reference.

112.   By virtue of his employment and position with B&W, Jackson had access to confidential information, including, but not limited to, B&W's financial information, business operations and strategy and business partner, vendor, customer and client information, as set forth above.

113.   This confidential and proprietary information has independent and intrinsic economic value constituting trade secret information of B&W.

114.   B&W has taken, and continues to take, reasonable precautions to preserve and protect that trade secret information from disclosure.

115.   Jackson intentionally misappropriated this trade secret information in violation of Ohio Revised Code §§ 1333.61, et. seq., by using this information for his own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W because B&W separated his employment and then did not respond affirmatively to his request for additional severance pay.

116.   As a result of this misappropriation, Jackson has directly and proximately caused damages to B&W in an amount to be determined at trial.

117.   In addition, B&W has suffered, and continues to suffer irreparable harm due to the misappropriation, dissemination, and misuse of its trade secrets and requires the issuance of a preliminary and permanent injunction, pursuant to Ohio Revised Code § 1333.62, to prevent further irreparable harm.

**COUNT VI**
**VIOLATION OF THE OHIO UNIFORM TRADE SECRETS**
**ACT – OHIO REVISED CODE §§ 1333.61, ET. SEQ.**
**DEFENDANT RHODES**

118.   The foregoing paragraphs are incorporated by reference.

119.   By virtue of his employment and position with B&W, Rhodes had access to confidential information, including, but not limited to, B&W's financial information, business operations and strategy and business partner, vendor, customer and client information, as set forth above.

120.   This confidential and proprietary information has independent and intrinsic economic value constituting trade secret information of B&W.

121.   B&W has taken, and continues to take, reasonable precautions to preserve and protect that trade secret information from disclosure.

122.   Rhodes intentionally misappropriated this trade secret information in violation of Ohio Revised Code §§ 1333.61, et. seq., by using this information for his own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W for separating his employment.

123.   As a result of this misappropriation, Rhodes has directly and proximately caused damages to B&W in an amount to be determined at trial.

124.   In addition, B&W has suffered, and continues to suffer irreparable harm due to the misappropriation, dissemination, and misuse of its trade secrets and requires the issuance of a preliminary and permanent injunction, pursuant to Ohio Revised Code § 1333.62, to prevent further irreparable harm.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**DEFENDANT JACKSON**

125.    The foregoing paragraphs are incorporated by reference.

126.    Upon information and belief, Defendant Jackson was aware of the existence of the Rhodes Agreement and its terms, identical to the Jackson Agreement.

127.    On or around December 2023, within days of the date Rhodes executed the Rhodes Agreement, Defendant Jackson sent several threatening and explicit email messages to B&W, requesting additional severance pay and threatening legal action.

128.    Upon information and belief, Jackson solicited, incented and enticed Rhodes to breach the Rhodes Agreement by participating in the process that resulted in the Rhodes's Affidavit.

129.    Jackson's interference with the Rhodes Agreement was improper, motivated by Jackson's own respective personal gain, for the gain of the plaintiffs in the New York Lawsuits, and in retribution against B&W because B&W separated his employment and then did not respond affirmatively to his request for additional severance pay.

130.    There is no legitimate justification for Jackson's actions.

131.    As a result of Jackson's misconduct, Jackson has directly and proximately caused damages to B&W in an amount to be determined at trial.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH**
**BUSINESS RELATIONSHIPS**
**DEFENDANTS JACKSON AND RHODES**

132.    The foregoing paragraphs are incorporated by reference.

133. Defendants have knowledge of B&W's business relationships, through their former respective employment relationships with B&W.

134. In completing their respective Affidavits (collectively, "Defendants' Affidavits"), on public record in the New York Lawsuits, Defendants have wrongfully interfered and are wrongfully interfering with B&W's present and future business relationships with its business partners, clients and vendors.

135. Defendants' Affidavits, part of public record in the New York Lawsuits, can be found by anyone in the public, including B&W's current or potential business relationships.

136. In addition to the misappropriation of trade secrets in Defendants' Affidavits, as described above, Defendants, in their creation of Defendants' Affidavits, intentionally seek to induce third parties to not enter into, or continue, a business or contractual relationship with B&W.

137. Defendants have motive to interfere with B&W's business relationships, as Defendants seek retribution for their respective separations of employment in 2023.

138. Defendant Jackson has motive to interfere with B&W's business relationships, in retribution against B&W because B&W separated his employment and then did not respond affirmatively to his request for additional severance pay.

139. By creating Defendants' Affidavits, Defendants have intentionally interfered with B&W's business relationships.

140. Defendants' creation of Defendants' Affidavits and Defendants' intentional interferences with B&W's business relationships are directly and proximately causing

damage to B&W, including, without limitation, irreparable injury for which B&W is entitled to preliminary and permanent injunctive relief.

141.   Defendants' conduct is without privilege and has been carried out with actual malice and/or a reckless indifference to the rights of B&W.

142.   As a result of this misconduct, Defendants have directly and proximately caused damages to B&W in an amount to be determined at trial.

**COUNT IX**
**CIVIL CONSPIRACY**
**DEFENDANTS JACKSON AND RHODES**

143.   The foregoing paragraphs are incorporated by reference.

144.   Defendants maliciously combined and conspired to create their respective Affidavits, to assist the plaintiffs in the New York Lawsuits.

145.   Defendants maliciously combined and conspired to cause damage to B&W, in retribution for their respective separations of employment.

146.   Defendants' conspiracy to create their respective Affidavits and cause injury to B&W was a malicious combination of two or more persons.

147.   Defendants performed an unlawful act by breaching their respective Pledges and Agreements.

148.   Defendants performed an unlawful act by misappropriating trade secrets, pursuant to 18 U.S.C. § 1836, as described above.

149.   Defendants performed an unlawful act by misappropriating trade secrets, in violation of the Ohio Uniform Trade Secrets Act, pursuant to Ohio Revised Code §§ 1333.61 et seq., as described above.

150.  As a result of the Defendants' malicious combination and conspiracy to damage B&W, Defendants are directly and proximately causing damage to B&W, in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Jackson and Rhodes, as follows:

1.  A preliminary and permanent injunction enjoining Jackson and Rhodes and all persons in active concert and participation with Defendants as follows:

    (a)  Defendants shall neither use for any purpose whatsoever, nor disclose to any person, B&W's confidential and proprietary information and trade secrets obtained by Defendants while employed by B&W.  This includes any use, by anyone, in the New York Lawsuits;

    (b)  Defendants shall return any and all documents, electronic files and/or information that they removed or caused to be removed from B&W and shall not directly or indirectly cease, delete, damage, destroy or otherwise compromise it or alter it in any manner, or permit the same to occur, whether the information exists in electronic or other format, or whether it is maintained by Defendants or others on their behalf.  The information specifically includes, but is not limited to, any and all text and email correspondence between Defendants Jackson and Rhodes, as well as individually and jointly with anyone associated with the New York Lawsuits, as well as attachments thereto and computer files in any format.

2.  Compensatory damages in an amount not less than $84,615.38 as to Defendant Jackson and $34,961.54 as to Defendant Rhodes;

3.  Upon application, an order providing for the seizure of property necessary to prevent the propagation or dissemination of the Plaintiffs' trade secrets, pursuant to 18 U.S.C.

§ 1836(2)(A)(i);

4.   An injunction to prevent actual or threatened misappropriation of the Plaintiffs' trade secrets, pursuant to 18 U.S.C. § 1836(3)(A)(i);

5.   An injunction requiring affirmative actions to be taken to protect the Plaintiffs' trade secrets, pursuant to 18 U.S.C. § 1836(3)(A)(ii);

6.   Should the Court find that exceptional circumstances that render an injunction inequitable exist, an injunction which conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited, pursuant to 18 U.S.C. § 1836(3)(A)(iii);

7.   Compensatory damages for B&W's actual loss caused by the Defendants' misappropriation of trade secrets, in an amount to be determined at trial, pursuant to 18 U.S.C. § 1836 (3)(B)(i)(I);

8.   Damages for any unjust enrichment caused by the misappropriation of the Plaintiffs' trade secrets that is not addressed in computing damages for actual loss, pursuant to 18 U.S.C. § 1836(3)(B)(i)(II);

9.   Damages, in lieu of damages measured by any other methods, caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Defendants' unauthorized disclosure or use of the trade secrets, pursuant to 18 U.S.C. § 1836(3)(B)(ii);

10.  Exemplary damages, in an amount not more than two times the amount of damages awarded under 18 U.S.C. § 1836(B), caused by the Defendants' willful and malicious misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836 (3)(C);

11.    Reasonable attorneys' fees caused by Defendants' willful and malicious misappropriation of trade secrets, pursuant to 18 U.S.C. § 1836 (3)(D);

12.    Upon application, an injunction against misappropriation of trade secrets, pursuant to Ohio Revised Code § 1333.62(A);

13.    Damages for the actual loss caused by Defendants' misappropriation of trade secrets pursuant to Ohio Revised Code § 1333.63(A);

14.    Damages for the unjust enrichment caused by the Defendants' misappropriation of trade secrets, that is not taken into account in computing actual loss, pursuant to Ohio Revised Code § 1333.63(A),

15.    Damages, in lieu of damages measured by any other methods, caused by the Defendants' misappropriation of trade secrets, measured by imposition of liability for a reasonable royalty that is equitable under the circumstances considering the loss to the Plaintiffs, the benefit to the Defendants, or both, for the Defendants' unauthorized disclosure or use of trade secrets, pursuant to Ohio Revised Code § 1333.63(A);

16.    Punitive or exemplary damages, due to the Defendants' willful and misappropriation of trade secrets, in an amount not exceeding three times the award made under Ohio Revised Code § 1333.63(A), pursuant to Ohio Revised Code § 1333.63(B);

17.    Reasonable attorneys' fees, due to the Defendants' willful and malicious misappropriation of the Plaintiffs' trade secrets, pursuant to Ohio Revised Code § 1333.64;

18.    Pre and post-judgment interest;

19.    Costs and attorneys' fees; and

20.    Such other and further relief as allowed by law and/or is equitable under the

circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of the maximum number on all issues.

Respectfully submitted,

*/s/ Thomas E. Green*
Thomas E. Green (#0075022)
tgreen@kwwlaborlaw.com
Catherine R. Gambill (#0092017)
cgambill@kwwlaborlaw.com
KASTNER WESTMAN & WILKINS, LLC
3550 W. Market Street, Suite 100
Akron, OH 44333
(p) 330.867.9998
(f) 330.867.3786

Attorneys for Plaintiffs