## SEPARATION AGREEMENT AND RELEASE OF CLAIMS

This Separation Agreement and Release of Claims ("Agreement") is made and entered into by and between Babcock & Wilcox Solar Holdings, LLC and its parent, subsidiary, related, and affiliated entities ("Company"), and James Jackson ("Employee"). Company and Employee are sometimes referred to individually as "Party" and are sometimes collectively referred to herein as "Parties."

## RECITALS

WHEREAS, Company has decided to proceed with an involuntary separation which results in the Employees' termination.

WHEREAS, Company has a desire to provide compensation and other benefits to Employee in connection with the Employee's termination, in exchange for a release of all claims, which shall act to fully, completely, and finally resolve any claims, disputes, differences, and disagreements that may have arisen from or relate to Employee's employment and/or termination of employment from Company.

NOW THEREFORE, in consideration of and in exchange for the promises, covenants, and releases contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## AGREEMENT

1. <u>Termination and Consideration</u>. Employee acknowledges that Employee's employment with Company ceased on August 11, 2023 (the "Termination Date"). Provided Employee signs this Agreement and does not revoke it under Paragraph 4(c), after the expiration of the Revocation Period (described in Paragraph 4(c)), in consideration of and in exchange for Employee's promises, covenants, and releases contained herein, Company agrees to provide the following consideration, and Employee agrees, in return, as follows:

(a)     As soon as is administratively practical after the expiration of the Revocation Period, Employee will receive sixteen (16) weeks of Employee's weekly base pay (such number of weeks shall hereinafter be referred to as the "Separation Pay"), paid as salary continuation as part of Company's ordinary payroll process. The Separation Pay will be subject to applicable withholdings for taxes and payroll deductions. Company will issue to Employee the appropriate IRS Form W-2 following the close of the applicable tax year(s).

(b)     Company will provide Employee access to outplacement services for a period of six (6) months following termination of employment.

(c)     Employee expressly acknowledges and agrees that Employee would not otherwise be entitled to the consideration set forth in this Paragraph 1 were it not for Employee's covenants, promises, and releases set forth hereunder. Employee also

Employee's Initials

Company's Initials

Page 1 of 7

EXHIBIT

A

acknowledges that the consideration Employee is receiving constitutes good and valuable consideration for the release by Employee. Employee expressly acknowledges that Company is providing good and valuable consideration to support this Agreement above and beyond any amounts or subjects that may have been owed or disputed.

2.      No Amounts Owing/Cessation of Benefits. Except as specified in this Agreement, Employee represents and affirms that Employee has been paid and/or received from Company all leave (paid or unpaid), compensation, wages (including a timely final paycheck and any overtime), bonuses, commissions, incentive pay, and/or benefits to which Employee may be entitled, and that no other leave (paid or unpaid), compensation, wages (including overtime), bonuses, commissions, incentive pay, and/or benefits are due to Employee. Further, Employee's entitlement to Company-paid employee benefits under all Company programs, including, but not limited to, life insurance, retirement benefits, and disability benefits will cease as of the Termination Date except as specified in this Agreement. This is not meant to and does not affect any accrued, vested retirement benefits or Employee's ability to exercise Employee's rights under the Consolidated Omnibus Budget Reconciliation Act of 1985.

3.      Waiver and Release. Employee agrees on behalf of Employee and Employee's heirs, executors, administrators, successors, and assigns, that Employee shall waive, release, and discharge Company, its past, present, and future parent and subsidiary corporations, divisions, affiliates, partners, joint ventures, stockholders, predecessors, successors, assigns, officers, directors, attorneys, agents, representatives, employees, former employees, Company's employee benefit plans (and any administrators, insurers, or fiduciaries thereof), and any other person, firm, or corporation with whom any of them are now or may hereafter be affiliated (collectively, the "Released Parties") from any and all claims, debts, promises, agreements, demands, causes of action, attorneys' fees, losses, and expenses of every nature whatsoever, known or unknown, suspected or unsuspected, filed or unfiled, arising prior to Employee's signing of this Agreement, or arising out of or in connection with Employee's employment by and/or termination of employment from Company. This total release includes, but is not limited to, all claims arising directly or indirectly from Employee's employment with and/or termination from Company, including, but not limited to, breach of contract, breach of the implied covenant of good faith and fair dealing, infliction of emotional harm, wrongful discharge, violation of public policy, defamation and impairment of economic opportunity, violation of any state or local administrative, statutory, or codified law or regulation dealing with fair employment practices, any claims for violation of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Employee Retirement Income Security Act, the Equal Pay Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the Rehabilitation Act of 1974, the Family and Medical Leave Act (FMLA), the Americans With Disabilities Act of 1990 (ADA), the ADA Amendments Act of 2008, the Consolidated Omnibus Budget Reconciliation Act of 1985, and any and all other federal, state, and local statutes, ordinances, executive orders, and regulations and any common law claims lying in contract, tort, or equity. It is expressly agreed that this Agreement shall operate as a clear and unequivocal waiver by Employee of any claim for benefits or consideration other than that which is set forth in Paragraphs 1 and 2 herein. Company and Employee agree that Employee has waived all claims against Company except those claims that as a matter of law are not waivable by an employee against his or her employer.

Employee's Initials

Company's Initials

Page 2 of 7

This Agreement does not include, and Employee does not waive, any rights or claims:  (a) that may arise after Employee signs this Agreement; (b) for alleged workplace injuries or occupational disease that arise under any state's workers' compensation laws; (c) for benefits in which Employee has a vested right under any pension plans; (d) that cannot be released by law; (e) to enforce this Agreement; or (f) to participate in any proceedings before an administrative agency responsible for enforcing labor and/or employment laws, such as the Equal Employment Opportunity Commission. Employee agrees, however, to waive and release any right to receive any monetary award from such administrative agency proceedings. Nothing in this Agreement shall be construed to limit Employee's right to respond accurately and fully to any question, inquiry or request for information when required by legal process or from initiating communications directly with, or responding to any inquiry from, or providing testimony before, any self-regulatory organization or state or federal regulatory authority, regarding Company, Employee's employment, or this Agreement. Employee is not required to contact Company regarding the subject matter of any such communications before engaging in such communications.

Employee acknowledges and agrees that Employee has no known work-related injuries or occupational diseases while employed by Company that were not reported during Employee's employment, and that Employee has been provided and/or has not been denied any leave requested under the FMLA and has not been subjected to retaliation for taking any such leave. Employee agrees and acknowledges that Employee was properly classified pursuant to the Fair Labor Standards Act and, even if that was not the case, the payments reflected herein fully compensate Employee for any unpaid wages, compensation, and/or overtime Employee would have been entitled to for the full limitations period if any exemption(s) did not apply to Employee, which Company does not concede.

Except as set forth in this Agreement, Employee understands, acknowledges, and voluntarily agrees that this Agreement is a total and complete release by Employee of any and all claims which Employee has against Company as of the date this Agreement is signed by Employee, both known or unknown, even though there may be facts or consequences of facts which are unknown to Employee.

4.    <u>Voluntary Release of Age Discrimination in Employment Act Claims</u>. Employee understands and agrees that by signing this Agreement, Employee is knowingly and voluntarily agreeing to waive and release any and all claims under the Age Discrimination in Employment Act (ADEA) Employee has had or may have against Company as of the date of signing of this Agreement by Employee. In accordance with the Older Workers Benefit Protection Act (OWBPA), Employee is advised of the following:

(a)    <u>Consultation with Counsel</u>.    Employee is hereby advised that this Agreement constitutes written notice from Company that Employee should consult with an attorney before signing this Agreement. Employee acknowledges that Employee has had an opportunity to, and did, fully discuss all aspects of this Agreement with an attorney to the extent Employee desired to do so. Employee agrees that Employee has carefully read and fully understands all of the provisions of this Agreement, and that Employee is voluntarily entering into this Agreement.

Employee's Initials
Company's Initials

(b)    Review Period. Employee is hereby advised that Employee may take up to twenty-one (21) calendar days, beginning on the day the Employee receives the Agreement, to review and consider this Agreement before signing.  In the event this Agreement is signed prior to the expiration of the twenty-one (21) day review period, Employee acknowledges that Employee voluntarily and knowingly agrees to waive Employee's entitlement to take twenty-one (21) days to consider this Agreement. Employee is further advised that if Employee fails to sign this Agreement within the twenty-one (21) day review period, then this Agreement shall become null and void, and Employee shall not receive the Separation Pay and other consideration offered by Company under the terms of this Agreement.

(c)    Revocation Period. Employee is hereby advised that Employee may revoke this Agreement within seven (7) calendar days after the date Employee signs this Agreement (the "Revocation Period"). Employee agrees that if Employee wishes to revoke this Agreement, Employee must notify Company in writing by sending Employee's revocation to HR Department, 1200 East Market Street, Suite 650, Akron, OH 44305, or to askhr@babcock.com, on or before the day the Revocation Period expires. Provided Employee does not revoke this Agreement, the Effective Date of this Agreement will be the eighth day after Employee signs this Agreement.

5.    Employment Verification. In response to requests for employment verification from prospective employers, Company agrees to provide a neutral employment reference for Employee, to include confirming dates of employment and job title.

6.    No Admission of Liability. Employee and Company hereby represent and warrant that this Agreement is not in any respect an admission or statement of liability or wrongdoing by either Employee or Company.

7.    Company Property. Employee hereby represents and warrants that as of the Termination Date, Employee has returned to Company and has not retained copies of all Company property, documents, and information in Employee's possession including, but not limited to, Company files, notes, records, models, electronically stored and/or computer recorded information, data, including but not limited to any confidential and/or proprietary data and/or information about Company's operations, business model, financial and accounting information, as well as any tangible property, such as credit cards, entry cards, pagers, identification badges, laptop computers, iPads, tablets, cellular phones, and keys, and any other documents, information, or Company property Employee has or had in Employee's possession, custody, or control.

8.    Confidential/Proprietary Information and Intellectual Property.  Employee understands and agrees that to the extent Employee has obligations under any Company policy, agreement, and/or and procedure regarding confidential or proprietary business, trade secret, or intellectual property, that those obligations survive and continue indefinitely after Employee's termination of employment. Accordingly, consistent with Company's policies and procedures, Employee agrees not to take and to return, and to keep and maintain as confidential, and not to use or disclose to others, any confidential or proprietary business, trade secret, or intellectual property, including but not limited to any such information as it pertains to Company, its finances, business operations, strategy and marketing, and Company's business partners, customers, clients, and

Employee's Initials _____

Company's Initials _____

Page 4 of 7

vendors that Employee acquired, had access to, or was privy to during Employee's employment with Company. Employee acknowledges and agrees that any remedies at law available to Company for any breach of Employee's obligations under this Paragraph would be inadequate and agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding, without the necessity of proof of actual damages. The rights and remedies of Company pursuant to this Paragraph are cumulative, in addition to, and shall not be deemed to exclude any other right or remedy which Company may have pursuant to this Agreement or otherwise, at law or in equity.

9.      <u>Confidentiality of Agreement</u>. Employee agrees to keep the terms, Separation Pay amount, and other consideration provided to Employee under this Agreement completely confidential and will not hereafter disclose any such information concerning this Agreement to anyone. However, Employee may make such disclosure to Employee's professional representatives (*e.g.*, attorneys, accountants, auditors, and tax preparers), all of whom will be informed of and agree to be bound by this confidentiality clause. Notwithstanding the foregoing, it shall not be a breach of this Paragraph 9 for either Party to disclose those portions of this Agreement as may be strictly necessary (a) to prepare a Party's income tax returns or financial records; (b) to satisfy the requirements of the law; (c) to comply with the lawful orders or processes of the courts; or (d) to enforce or comply with this Agreement.

10.     <u>Medicare Representations</u>. Employee affirms, covenants, and warrants that Employee is not a Medicare beneficiary and is not receiving, has not received in the past, will not have received at the time of payment under this Agreement, is not entitled to, is not eligible for, and has not applied for or sought Social Security Disability or Medicare benefits.  If any statement in the preceding sentence is incorrect (for example, but not limited to, if Employee is a Medicare beneficiary, etc.), the following sentences (i.e., the remaining sentences of this Paragraph) apply. Employee affirms, covenants, and warrants Employee has made no claim for illness or injury against, nor is Employee aware of any facts supporting any claim against, the Released Parties under which the Released Parties could be liable for medical expenses incurred by Employee before or after the signing of this Agreement.  Employee knows of no medical expenses that Medicare has paid and for which the Released Parties are or could be liable now or in the future. Employee agrees and affirms that, to the best of Employee's knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist. Employee will indemnify, defend, and hold the Released Parties harmless from Medicare claims, liens, damages, conditional payments, and rights to payment, if any, including attorneys' fees, and Employee further agrees to waive any and all future private causes of action for damages under 42 U.S.C. §§ 1395y(b)(3)(A), *et seq*. Company and Employee acknowledge and understand that any present or future action or decision by the Centers for Medicare & Medicaid Services or Medicare on this Agreement, or Employee's eligibility or entitlement to Medicare or Medicare payments, will not render this release void or ineffective, or in any way affect the finality of this Agreement.

11.     <u>Entire Agreement</u>. This Agreement embodies the entire Agreement of the Parties and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or written, express or implied, between the Parties; provided, however, that the terms of any non-disclosure, non-competition or non-solicitation entered into by Employee and Company prior to or during Employee's employment shall survive the termination of Employee's employment and remain in full force and effect. The Parties acknowledge that no representations, inducements,

Employee's Initials

Company's Initials

promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in this Agreement; that they have not signed this Agreement in reliance on any representation, inducement, promise, agreements, warranty, fact, or circumstances not expressly set forth in this Agreement; and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement including, but not limited to, any purported settlements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless signed in writing by the Parties to this Agreement. This Agreement may be amended, and any provision herein waived, but only in writing, signed by the Party against whom such an amendment or waiver is sought to be enforced.

12.    <u>Binding Nature</u>. This Agreement, and all the terms and provisions contained herein, shall bind the heirs, personal representatives, successors, and assigns of each Party, and inure to the benefit of each Party, their agents, directors, officers, employees, servants, successors, and assigns.

13.    <u>Construction</u>. This Agreement shall not be construed in favor of one Party or against the other.

14.    <u>Partial Invalidity</u>. This Agreement shall be deemed to consist of a series of separate covenants. If any separate covenant, word, clause, phrase, sentence, paragraph, or provision of this Agreement be declared void or is found unenforceable, it may be modified by a court to make it enforceable and/or severed from this Agreement with the remainder of the Agreement remaining in full force and effect.

15.    <u>Compliance with Terms</u>. The failure to insist upon compliance with any term, covenant, or condition contained in this Agreement shall not be deemed a waiver of that term, covenant, or condition, nor shall any waiver or relinquishment of any right or power contained in this Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

16.    <u>Enforcement Costs</u>. The Parties agree that in the event a Party breaches any provision of this Agreement, the breaching Party shall pay all costs and reasonable attorneys' fees incurred in conjunction with the enforcement of this Agreement to the extent permitted by law.

17.    <u>Governing Law; Jurisdiction; Venue</u>. This Agreement shall be interpreted under the laws of the State of Ohio, both as to interpretation, performance, and enforcement, without regard to choice of law provisions that would cause the application of the law of another jurisdiction, except to the extent such laws are preempted by federal law. The sole and exclusive venue for disputes involving this Agreement shall be the court, state or federal, having jurisdiction over Summit County, Ohio.

18.    <u>Voluntary and Knowing</u>. This Agreement is signed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto.

19.    <u>Counterparts</u>. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Employee's Initials

Company's Initials

20.　　Headings. The headings appearing in this Agreement are for convenience only and are not to be considered in interpreting this Agreement.

　　　The Parties agree that they have read this Agreement, understand and agree to its terms, and have knowingly and voluntarily signed it on the dates written below.

Dated this 25th　day of　August　, 2023.

_____

_ Employee Signature

_James H. Jackson_____

Employee Name

　　4.

Dated this 29 day of　August　, 2023.

Babcock & Wilcox Solar Holdings, LLC

By: _____

Its: VP CORPORATE OPERATIONS

Employee's Initials _____

Company's Initials _____

## SEPARATION AGREEMENT AND RELEASE OF CLAIMS

This Separation Agreement and Release of Claims ("Agreement") is made and entered into by and between Babcock & Wilcox Solar Holdings, LLC and its parent, subsidiary, related, and affiliated entities ("Company"), and Collin Rhodes ("Employee"). Company and Employee are sometimes referred to individually as "Party" and are sometimes collectively referred to herein as "Parties."

## RECITALS

WHEREAS, Company has decided to proceed with an involuntary separation which results in the Employees' termination.

WHEREAS, Company has a desire to provide compensation and other benefits to Employee in connection with the Employee's termination, in exchange for a release of all claims, which shall act to fully, completely, and finally resolve any claims, disputes, differences, and disagreements that may have arisen from or relate to Employee's employment and/or termination of employment from Company.

NOW THEREFORE, in consideration of and in exchange for the promises, covenants, and releases contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## AGREEMENT

1.    Termination and Consideration. Employee acknowledges that Employee's employment with Company ceased on November 30, 2023 (the "Termination Date"). Provided Employee signs this Agreement and does not revoke it under Paragraph 4(c), after the expiration of the Revocation Period (described in Paragraph 4(c)), in consideration of and in exchange for Employee's promises, covenants, and releases contained herein, Company agrees to provide the following consideration, and Employee agrees, in return, as follows:

(a)    As soon as is administratively practical after the expiration of the Revocation Period, Employee will receive eight (8) weeks of Employee's weekly base pay (such number of weeks shall hereinafter be referred to as the "Separation Pay"), paid as salary continuation as part of Company's ordinary payroll process. The Separation Pay will be subject to applicable withholdings for taxes and payroll deductions. Company will issue to Employee the appropriate IRS Form W-2 following the close of the applicable tax year(s).

(b)    Company will provide Employee access to outplacement services for a period of three (3) months following termination of employment.

(c)    Employee expressly acknowledges and agrees that Employee would not otherwise be entitled to the consideration set forth in this Paragraph 1 were it not for Employee's covenants, promises, and releases set forth hereunder. Employee also

Employee's Initials:

Company's Initials:

Page 1 of 7

EXHIBIT

B

acknowledges that the consideration Employee is receiving constitutes good and valuable consideration for the release by Employee. Employee expressly acknowledges that Company is providing good and valuable consideration to support this Agreement above and beyond any amounts or subjects that may have been owed or disputed.

2.    No Amounts Owing/Cessation of Benefits. Except as specified in this Agreement, Employee represents and affirms that Employee has been paid and/or received from Company all leave (paid or unpaid), compensation, wages (including a timely final paycheck and any overtime), bonuses, commissions, incentive pay, and/or benefits to which Employee may be entitled, and that no other leave (paid or unpaid), compensation, wages (including overtime), bonuses, commissions, incentive pay, and/or benefits are due to Employee. Further, Employee's entitlement to Company-paid employee benefits under all Company programs, including, but not limited to, life insurance, retirement benefits, and disability benefits will cease as of the Termination Date except as specified in this Agreement. This is not meant to and does not affect any accrued, vested retirement benefits or Employee's ability to exercise Employee's rights under the Consolidated Omnibus Budget Reconciliation Act of 1985.

3.    Waiver and Release. Employee agrees on behalf of Employee and Employee's heirs, executors, administrators, successors, and assigns, that Employee shall waive, release, and discharge Company, its past, present, and future parent and subsidiary corporations, divisions, affiliates, partners, joint ventures, stockholders, predecessors, successors, assigns, officers, directors, attorneys, agents, representatives, employees, former employees, Company's employee benefit plans (and any administrators, insurers, or fiduciaries thereof), and any other person, firm, or corporation with whom any of them are now or may hereafter be affiliated (collectively, the "Released Parties") from any and all claims, debts, promises, agreements, demands, causes of action, attorneys' fees, losses, and expenses of every nature whatsoever, known or unknown, suspected or unsuspected, filed or unfiled, arising prior to Employee's signing of this Agreement, or arising out of or in connection with Employee's employment by and/or termination of employment from Company. This total release includes, but is not limited to, all claims arising directly or indirectly from Employee's employment with and/or termination from Company, including, but not limited to, breach of contract, breach of the implied covenant of good faith and fair dealing, infliction of emotional harm, wrongful discharge, violation of public policy, defamation and impairment of economic opportunity, violation of any state or local administrative, statutory, or codified law or regulation dealing with fair employment practices, any claims for violation of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Employee Retirement Income Security Act, the Equal Pay Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the Rehabilitation Act of 1974, the Family and Medical Leave Act (FMLA), the Americans With Disabilities Act of 1990 (ADA), the ADA Amendments Act of 2008, the Consolidated Omnibus Budget Reconciliation Act of 1985, and any and all other federal, state, and local statutes, ordinances, executive orders, and regulations and any common law claims lying in contract, tort, or equity. It is expressly agreed that this Agreement shall operate as a clear and unequivocal waiver by Employee of any claim for benefits or consideration other than that which is set forth in Paragraphs 1 and 2 herein. Company and Employee agree that Employee has waived all claims against Company except those claims that as a matter of law are not waivable by an employee against his or her employer.

Employee's Initials ___

Company's Initials ___

This Agreement does not include, and Employee does not waive, any rights or claims: (a) that may arise after Employee signs this Agreement; (b) for alleged workplace injuries or occupational disease that arise under any state's workers' compensation laws; (c) for benefits in which Employee has a vested right under any pension plans; (d) that cannot be released by law; (e) to enforce this Agreement; or (f) to participate in any proceedings before an administrative agency responsible for enforcing labor and/or employment laws, such as the Equal Employment Opportunity Commission. Employee agrees, however, to waive and release any right to receive any monetary award from such administrative agency proceedings. Nothing in this Agreement shall be construed to limit Employee's right to respond accurately and fully to any question, inquiry or request for information when required by legal process or from initiating communications directly with, or responding to any inquiry from, or providing testimony before, any self-regulatory organization or state or federal regulatory authority, regarding Company, Employee's employment, or this Agreement. Employee is not required to contact Company regarding the subject matter of any such communications before engaging in such communications.

Employee acknowledges and agrees that Employee has no known work-related injuries or occupational diseases while employed by Company that were not reported during Employee's employment, and that Employee has been provided and/or has not been denied any leave requested under the FMLA and has not been subjected to retaliation for taking any such leave. Employee agrees and acknowledges that Employee was properly classified pursuant to the Fair Labor Standards Act and, even if that was not the case, the payments reflected herein fully compensate Employee for any unpaid wages, compensation, and/or overtime Employee would have been entitled to for the full limitations period if any exemption(s) did not apply to Employee, which Company does not concede.

Except as set forth in this Agreement, Employee understands, acknowledges, and voluntarily agrees that this Agreement is a total and complete release by Employee of any and all claims which Employee has against Company as of the date this Agreement is signed by Employee, both known or unknown, even though there may be facts or consequences of facts which are unknown to Employee.

4.      Voluntary Release of Age Discrimination in Employment Act Claims. Employee understands and agrees that by signing this Agreement, Employee is knowingly and voluntarily agreeing to waive and release any and all claims under the Age Discrimination in Employment Act (ADEA) Employee has had or may have against Company as of the date of signing of this Agreement by Employee. In accordance with the Older Workers Benefit Protection Act (OWBPA), Employee is advised of the following:

(a)     Consultation with Counsel. Employee is hereby advised that this Agreement constitutes written notice from Company that Employee should consult with an attorney before signing this Agreement. Employee acknowledges that Employee has had an opportunity to, and did, fully discuss all aspects of this Agreement with an attorney to the extent Employee desired to do so. Employee agrees that Employee has carefully read and fully understands all of the provisions of this Agreement, and that Employee is voluntarily entering into this Agreement.

Employee's Initials

Company's Initials

(b)     Review Period. Employee is hereby advised that Employee may take up to twenty-one (21) calendar days, beginning on the day the Employee receives the Agreement, to review and consider this Agreement before signing.  In the event this Agreement is signed prior to the expiration of the twenty-one (21) day review period, Employee acknowledges that Employee voluntarily and knowingly agrees to waive Employee's entitlement to take twenty-one (21) days to consider this Agreement. Employee is further advised that if Employee fails to sign this Agreement within the twenty-one (21) day review period, then this Agreement shall become null and void, and Employee shall not receive the Separation Pay and other consideration offered by Company under the terms of this Agreement.

(c)     Revocation Period. Employee is hereby advised that Employee may revoke this Agreement within seven (7) calendar days after the date Employee signs this Agreement (the "Revocation Period"). Employee agrees that if Employee wishes to revoke this Agreement, Employee must notify Company in writing by sending Employee's revocation to HR Department, 1200 East Market Street, Suite 650, Akron, OH 44305, or to askhr@babcock.com, on or before the day the Revocation Period expires. Provided Employee does not revoke this Agreement, the Effective Date of this Agreement will be the eighth day after Employee signs this Agreement.

5.      Employment Verification. In response to requests for employment verification from prospective employers, Company agrees to provide a neutral employment reference for Employee, to include confirming dates of employment and job title.

6.      No Admission of Liability. Employee and Company hereby represent and warrant that this Agreement is not in any respect an admission or statement of liability or wrongdoing by either Employee or Company.

7.      Company Property. Employee hereby represents and warrants that as of the Termination Date, Employee has returned to Company and has not retained copies of all Company property, documents, and information in Employee's possession including, but not limited to, Company files, notes, records, models, electronically stored and/or computer recorded information, data, including but not limited to any confidential and/or proprietary data and/or information about Company's operations, business model, financial and accounting information, as well as any tangible property, such as credit cards, entry cards, pagers, identification badges, laptop computers, iPads, tablets, cellular phones, and keys, and any other documents, information, or Company property Employee has or had in Employee's possession, custody, or control.

8.      Confidential/Proprietary Information and Intellectual Property. Employee understands and agrees that to the extent Employee has obligations under any Company policy, agreement, and/or and procedure regarding confidential or proprietary business, trade secret, or intellectual property, that those obligations survive and continue indefinitely after Employee's termination of employment. Accordingly, consistent with Company's policies and procedures, Employee agrees not to take and to return, and to keep and maintain as confidential, and not to use or disclose to others, any confidential or proprietary business, trade secret, or intellectual property, including but not limited to any such information as it pertains to Company, its finances, business operations, strategy and marketing, and Company's business partners, customers, clients, and

Employee's Initials _____

Company's Initials _____

vendors that Employee acquired, had access to, or was privy to during Employee's employment with Company. Employee acknowledges and agrees that any remedies at law available to Company for any breach of Employee's obligations under this Paragraph would be inadequate and agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding, without the necessity of proof of actual damages. The rights and remedies of Company pursuant to this Paragraph are cumulative, in addition to, and shall not be deemed to exclude any other right or remedy which Company may have pursuant to this Agreement or otherwise, at law or in equity.

9.      Confidentiality of Agreement. Employee agrees to keep the terms, Separation Pay amount, and other consideration provided to Employee under this Agreement completely confidential and will not hereafter disclose any such information concerning this Agreement to anyone. However, Employee may make such disclosure to Employee's professional representatives (*e.g.*, attorneys, accountants, auditors, and tax preparers), all of whom will be informed of and agree to be bound by this confidentiality clause. Notwithstanding the foregoing, it shall not be a breach of this Paragraph 9 for either Party to disclose those portions of this Agreement as may be strictly necessary (a) to prepare a Party's income tax returns or financial records; (b) to satisfy the requirements of the law; (c) to comply with the lawful orders or processes of the courts; or (d) to enforce or comply with this Agreement.

10.     Medicare Representations. Employee affirms, covenants, and warrants that Employee is not a Medicare beneficiary and is not receiving, has not received in the past, will not have received at the time of payment under this Agreement, is not entitled to, is not eligible for, and has not applied for or sought Social Security Disability or Medicare benefits. If any statement in the preceding sentence is incorrect (for example, but not limited to, if Employee is a Medicare beneficiary, etc.), the following sentences (i.e., the remaining sentences of this Paragraph) apply. Employee affirms, covenants, and warrants Employee has made no claim for illness or injury against, nor is Employee aware of any facts supporting any claim against, the Released Parties under which the Released Parties could be liable for medical expenses incurred by Employee before or after the signing of this Agreement. Employee knows of no medical expenses that Medicare has paid and for which the Released Parties are or could be liable now or in the future. Employee agrees and affirms that, to the best of Employee's knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist. Employee will indemnify, defend, and hold the Released Parties harmless from Medicare claims, liens, damages, conditional payments, and rights to payment, if any, including attorneys' fees, and Employee further agrees to waive any and all future private causes of action for damages under 42 U.S.C. §§ 1395y(b)(3)(A), *et seq.* Company and Employee acknowledge and understand that any present or future action or decision by the Centers for Medicare & Medicaid Services or Medicare on this Agreement, or Employee's eligibility or entitlement to Medicare or Medicare payments, will not render this release void or ineffective, or in any way affect the finality of this Agreement.

11.     Entire Agreement. This Agreement embodies the entire Agreement of the Parties and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or written, express or implied, between the Parties; provided, however, that the terms of any non-disclosure, non-competition or non-solicitation entered into by Employee and Company prior to or during Employee's employment shall survive the termination of Employee's employment and remain in full force and effect. The Parties acknowledge that no representations, inducements,

Employee's Initials _____

Company's Initials _____

promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in this Agreement; that they have not signed this Agreement in reliance on any representation, inducement, promise, agreements, warranty, fact, or circumstances not expressly set forth in this Agreement; and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement including, but not limited to, any purported settlements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless signed in writing by the Parties to this Agreement. This Agreement may be amended, and any provision herein waived, but only in writing, signed by the Party against whom such an amendment or waiver is sought to be enforced.

12.     Binding Nature. This Agreement, and all the terms and provisions contained herein, shall bind the heirs, personal representatives, successors, and assigns of each Party, and inure to the benefit of each Party, their agents, directors, officers, employees, servants, successors, and assigns.

13.     Construction. This Agreement shall not be construed in favor of one Party or against the other.

14.     Partial Invalidity. This Agreement shall be deemed to consist of a series of separate covenants. If any separate covenant, word, clause, phrase, sentence, paragraph, or provision of this Agreement be declared void or is found unenforceable, it may be modified by a court to make it enforceable and/or severed from this Agreement with the remainder of the Agreement remaining in full force and effect.

15.     Compliance with Terms. The failure to insist upon compliance with any term, covenant, or condition contained in this Agreement shall not be deemed a waiver of that term, covenant, or condition, nor shall any waiver or relinquishment of any right or power contained in this Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

16.     Enforcement Costs. The Parties agree that in the event a Party breaches any provision of this Agreement, the breaching Party shall pay all costs and reasonable attorneys' fees incurred in conjunction with the enforcement of this Agreement to the extent permitted by law.

17.     Governing Law; Jurisdiction; Venue. This Agreement shall be interpreted under the laws of the State of Ohio, both as to interpretation, performance, and enforcement, without regard to choice of law provisions that would cause the application of the law of another jurisdiction, except to the extent such laws are preempted by federal law. The sole and exclusive venue for disputes involving this Agreement shall be the court, state or federal, having jurisdiction over Summit County, Ohio.

18.     Voluntary and Knowing. This Agreement is signed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto.

19.     Counterparts. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Employee's Initials ___

Company's Initials ___

20.     Headings. The headings appearing in this Agreement are for convenience only and are not to be considered in interpreting this Agreement.

**The Parties agree that they have read this Agreement, understand and agree to its terms, and have knowingly and voluntarily signed it on the dates written below.**

Dated this _21_ day of _December_, 2023.

Dated this _03_ day of _January_ , 2023.

Babcock & Wilcox Solar Holdings, LLC

By: _____

Employee Signature

_Collis J. Rhodes_
Employee Name

Its: _VP Corporate Operations_

## CONFIDENTIALITY POLICY AND PLEDGE

As a result of working for Fosler Construction Company Inc. any information that an employee learns about the company, its members, or donors, that is not otherwise publicly available, constitutes as confidential information. Employees may not disclose confidential information to anyone who is not employed by the company. or to other company employees who do not need to know such information to assist in rendering services.

The disclosure, distribution, electronic transmission or copying of the company's confidential information is prohibited. Any employee who discloses confidential company information will be subject to disciplinary action (including possible separation), even if he or she does not actually benefit from the disclosure of such information.

I understand the above policy and pledge not to disclose confidential information.

Employee Signature                         Employee Printed Name

X _____                   X _JAMES HEATH JACKSON_
Signature & Date                           _2.23. 2022_
                                           Printed Name & Date

Company Representative

X _____ 2/23/22
Signature & Date

EXHIBIT
C

Fosler Construction Company, Inc.
EMPLOYEE HANDBOOK

Rev 11/2021

## CONFIDENTIALITY POLICY AND PLEDGE

As a result of working for Fosler Construction Company Inc. any information that an employee learns about the company, its members, or donors, that is not otherwise publicly available, constitutes as confidential information. Employees may not disclose confidential information to anyone who is not employed by the company. or to other company employees who do not need to know such information to assist in rendering services.

The disclosure, distribution, electronic transmission or copying of the company's confidential information is prohibited. Any employee who discloses confidential company information will be subject to disciplinary action (including possible separation), even if he or she does not actually benefit from the disclosure of such information.

I understand the above policy and pledge not to disclose confidential information.

Employee Signature                         Employee Printed Name

X *Collin Rhodes*          12/07/2021          X  Collin Rhodes          12/07/2021
Signature & Date                                   Printed Name & Date
Signer ID: ZLSMQWMEOW...

Company Representative

X _____          12/07/2021
Signature & Date
Signer ID: D5QRS6EV8G...

EXHIBIT
D
tabbies*

Fosler Construction Company, Inc.
EMPLOYEE HANDBOOK

Rev 11/2021

Document ID: o4e4777e547ae5b0f849846b1499208843e96874a8713107e7587cc9a32114ca

STATE OF NEW YORK
SUPREME COURT : ST. LAWRENCE COUNTY

THE L.C. WHITFORD CO., INC., et al.

                                   Plaintiffs,

     v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
F/K/A FOSLER CONSTRUCTION COMPANY, INC.,
BABCOCK & WILCOX ENTERPRISES, INC., et al.

                               Defendants.

Index No. EFCV-24-165710

IAS No. 44-1-2024-0042

**Hon. Mary M. Farley, J.S.C**

Motion Nos. 2 and 3

## AFFIDAVIT OF JAMES JACKSON

**EXHIBIT**

**E**

## AFFIDAVIT OF JAMES JACKSON

STATE OF ALABAMA      )
                      ) ss.:
COUNTY OF SHELBY      )

JAMES JACKSON, being duly sworn, deposes and says:

### I.      Background

1.      I have over 30 years of experience in the construction and energy sectors, and specialize in utility-scale solar power and renewables.

2.      I was previously the Chief Executive Officer ("CEO") of Babcock & Wilcox Solar Energy, Inc. f/k/a Fosler Construction Company, Inc.

3.      Before I joined Fosler Construction Company Inc. ("Fosler"), Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased an ownership stake in Fosler.

4.      I joined Fosler as its Chief Operating Officer ("COO") in February 2022. At that time, Fosler was partially owned by Paul Fosler ("Mr. Fosler"), and Mr. Fosler was its President and CEO.

5.      B&W Enterprises thereafter acquired the remaining ownership interests in Fosler from Mr. Fosler.

6.      After B&W Enterprises purchased the remaining ownership interests in Fosler, Mr. Fosler left the company and I became CEO of Fosler.

7.      In or around October of 2022, B&W Enterprises changed Fosler's name to Babcock & Wilcox Solar Energy, Inc. ("B&W Solar"). I remained CEO of B&W Solar after the name change.

8.      Although I was B&W Solar's CEO in name, I had no control over B&W
Solar's business operation and had no independent authority to make financial decisions or
take financial action on behalf of B&W Solar.  In fact, no B&W Solar employee had the
authority to make economic decisions or take financial actions on behalf of B&W Solar
without consent and approval from the B&W Enterprises.

9.      In particular, the following B&W Enterprises' executives and employees
controlled B&W Solar's business operations, actions, and decisions:

    a.  Kenneth Young, Chief Executive Officer of B&W Enterprises;

    b.  Louis Salamone, Executive Vice President, Chief Financial Officer, and
Chief Accounting Officer of B&W Enterprises;

    c.  Jimmy Morgan, Chief Operating Officer of B&W Enterprises; and

    d.  Cameron Frymyer, Controller and Vice President of Finance of B&W
Enterprises.

(Collectively, the "B&W Enterprises Management Team").

10.     B&W Enterprises, through the B&W Enterprises Management Team,
controlled all B&W Solar's business decisions and actions, including all B&W Solar's
financial decisions, bank accounts and assets, monetary transfers, what third parties should be
paid by B&W Solar, when they should be paid, and how much they should be paid.

11.     Neither I as CEO of B&W Solar, nor B&W Solar as an entity, could take
business or operational action without authorization from B&W Enterprises acting through
the B&W Management Team.

12.     I cannot exaggerate how tight the B&W Management Team's grip and control was over B&W Solar's operations and financial decisions. They needed to approve B&W Solar business decisions, financial actions, payments, non-payments, and monetary transfers. Although I was the CEO of B&W Solar, I had no authority over its bank accounts, was not a signatory to its bank accounts, and needed approval and authorization from B&W Enterprises via the B&W Enterprises Management Team to transfer or expend any B&W Solar funds.

13.     I reported to and took direction from all four members of the B&W Solar Management Team, but my interaction and work was weighted more toward Mr. Morgan, Mr. Frymyer, and Mr. Salamone. All actions or decisions concerning B&W Solar, however, were discussed collectively between and decided jointly by the B&W Enterprises Management Team. They worked as a tight group and anything discussed with one B&W Enterprises Management Team member was quickly shared with and known to all members.

14.     B&W Solar was undercapitalized to meet its financial obligations and relied on influxes of capital from B&W Enterprises to operate. It is my understanding that B&W Enterprises commingled and transferred the funds of and between B&W Solar, B&W Enterprises, and other B&W entities without distinction based on the decisions and needs of the B&W Enterprises Management Team.

15.     In sum, B&W Enterprises and the B&W Enterprises Management Team treated B&W Solar as a part of B&W Enterprises, not as a separate entity, and fully controlled and dominated B&W Solar, including controlling B&W Solar's assets, finances, monetary transfers, and payments.

## II.     The New York Solar Farm Projects

16.     Prior to the sale of Fosler to B&W Enterprises, Fosler, as General Contractor, entered agreements contracts (the "Prime Contracts") with single-purpose entities created and owned by Green Street Power Partners LLC, as Owner, to perform solar farm construction projects in New York (collectively, the "New York Solar Projects").

17.     Fosler and B&W Solar, as General Contractor, subcontracted and directed subcontractors to perform the work on the New York Solar Farm Projects, including subcontractors The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

18.     As CEO of B&W Solar, had frequent discussions with the B&W Management Team, and also met formally with the B&W Management Team on a monthly basis in "PAR" (Project Assessment of Risks) meetings during which I presented updates, status, and project assessments related the B&W Solar business, including the New York Solar Projects.

19.     In connection with discussing the New York Solar Projects, B&W Management Team openly discussed not paying subcontractors for their work on the New York Solar Projects as a way to recover losses arising from B&W Enterprises' purchase of Fosler that included the Prime Contracts and the New York Solar Projects.

20.     At a PAR meeting with the B&W Management Team in February or March 2023, I raised concerns regarding B&W Solar's inability to pay for the subcontractors' work on the New York Solar Project. Mr. Frymyer of the B&W Management Team advised that the subcontractors should be directed to perform the work even though they may not be paid for it. Mr. Frymyer noted that many of the subcontractors were directed and agreed to perform work without a written contract or written change order from B&W Solar. I specifically recall

Mr. Frymyer stating that we should direct the subcontractors to do the work, but, when it came to payment, "the hell with them" because they do not have a written agreement.

21.    I also recall a meeting with the B&W Management Team where they specifically discussed monies owed by B&W Solar to Whitford. Although the B&W Management Team knew that Whitford's work was done as directed, and monies were due and owing, the B&W Management Team "dribbled" Whitford money sufficient to keep them working. With regard to Whitford's inquiries regarding payment, I specifically recall Mr. Morgan of the B&W Management Team stating that Whitford does not have a written agreement and can "pound sand."

22.    I also recall that in a private conversation with Mr. Salamone of the B&W Management Team concerning transferring funds between B&W Solar and B&W Enterprises, and the use of funds received for one project to pay expenses for a separate projects. I advised that based on my decades of experience in construction, it was my understanding that it was improper to commingle funds between projects, including that it was improper for B&W Enterprises to take monies received by B&W Solar for one project and apply them to a separate project. I was asked to leave B&W Solar's employ shortly after that discussion with Mr. Salamone. I left B&W Solar's employ in August 2023.

I swear under penalty of perjury that the foregoing is true and correct.

JAMES JACKSON

Sworn to before me this
27 day of 03, 2024

Notary Public

12/18/2027

STATE OF NEW YORK
SUPREME COURT : COUNTY OF LEWIS

_____

SMOKE RIVER, LLC,

                                    Plaintiff,                    Index No. EFCA2024-000085

        v.

BABCOCK & WILCOX SOLAR ENERGY, INC.          **Hon. Charles C. Merrell, J.S.C.**
f/k/a FOSLER CONSTRUCTION COMPANY, INC.,
et al.

                                                                  Motion Nos. 1 and 2

                                    Defendants.

_____

---

## AFFIDAVIT OF JAMES JACKSON

---

## AFFIDAVIT OF JAMES JACKSON

STATE OF ALABAMA    )
                           ) ss.:
COUNTY OF SHELBY    )

JAMES JACKSON, being duly sworn, deposes and says:

### I.    Background

1.    I have over 30 years of experience in the construction and energy sectors, and specialize in utility-scale solar power and renewables.

2.    I was previously the Chief Executive Officer ("CEO") of Babcock & Wilcox Solar Energy, Inc. f/k/a Fosler Construction Company, Inc.

3.    Before I joined Fosler Construction Company Inc. ("Fosler"), Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased an ownership stake in Fosler.

4.    I joined Fosler as its Chief Operating Officer ("COO") in February 2022. At that time, Fosler was partially owned by Paul Fosler ("Mr. Fosler"), and Mr. Fosler was its President and CEO.

5.    B&W Enterprises thereafter acquired the remaining ownership interests in Fosler from Mr. Fosler.

6.    After B&W Enterprises purchased the remaining ownership interests in Fosler, Mr. Fosler left the company and I became CEO of Fosler.

7.    In or around October of 2022, B&W Enterprises changed Fosler's name to Babcock & Wilcox Solar Energy, Inc. ("B&W Solar"). I remained CEO of B&W Solar after the name change.

8.      Although I was B&W Solar's CEO in name, I had no control over B&W Solar's business operation and had no independent authority to make financial decisions or take financial action on behalf of B&W Solar.  In fact, no B&W Solar employee had the authority to make economic decisions or take financial actions on behalf of B&W Solar without consent and approval from the B&W Enterprises.

9.      In particular, the following B&W Enterprises' executives and employees controlled B&W Solar's business operations, actions, and decisions:

    a.  Kenneth Young, Chief Executive Officer of B&W Enterprises;

    b.  Louis Salamone, Executive Vice President, Chief Financial Officer, and Chief Accounting Officer of B&W Enterprises;

    c.  Jimmy Morgan, Chief Operating Officer of B&W Enterprises; and

    d.  Cameron Frymyer, Controller and Vice President of Finance of B&W Enterprises.

(Collectively, the "B&W Enterprises Management Team").

10.     B&W Enterprises, through the B&W Enterprises Management Team, controlled all B&W Solar's business decisions and actions, including all B&W Solar's financial decisions, bank accounts and assets, monetary transfers, what third parties should be paid by B&W Solar, when they should be paid, and how much they should be paid.

11.     Neither I as CEO of B&W Solar, nor B&W Solar as an entity, could take business or operational action without authorization from B&W Enterprises acting through the B&W Management Team.

12.     I cannot exaggerate how tight the B&W Management Team's grip and control was over B&W Solar's operations and financial decisions. They needed to approve B&W Solar business decisions, financial actions, payments, non-payments, and monetary transfers. Although I was the CEO of B&W Solar, I had no authority over its bank accounts, was not a signatory to its bank accounts, and needed approval and authorization from B&W Enterprises via the B&W Enterprises Management Team to transfer or expend any B&W Solar funds.

13.     I reported to and took direction from all four members of the B&W Solar Management Team, but my interaction and work was weighted more toward Mr. Morgan, Mr. Frymyer, and Mr. Salamone.  All actions or decisions concerning B&W Solar, however, were discussed collectively between and decided jointly by the B&W Enterprises Management Team. They worked as a tight group and anything discussed with one B&W Enterprises Management Team member was quickly shared with and known to all members.

14.     B&W Solar was undercapitalized to meet its financial obligations and relied on influxes of capital from B&W Enterprises to operate.  It is my understanding that B&W Enterprises commingled and transferred the funds of and between B&W Solar, B&W Enterprises, and other B&W entities without distinction based on the decisions and needs of the B&W Enterprises Management Team.

15.     In sum, B&W Enterprises and the B&W Enterprises Management Team treated B&W Solar as a part of B&W Enterprises, not as a separate entity, and fully controlled and dominated B&W Solar, including controlling B&W Solar's assets, finances, monetary transfers, and payments.

## II.     The New York Solar Farm Projects

16.     Prior to the sale of Fosler to B&W Enterprises, Fosler, as General Contractor, entered agreements contracts (the "Prime Contracts") with single-purpose entities created and owned by Green Street Power Partners LLC, as Owner, to perform solar farm construction projects in New York (collectively, the "New York Solar Projects").

17.     Fosler and B&W Solar, as General Contractor, subcontracted and directed subcontractors to perform the work on the New York Solar Farm Projects, including subcontractors The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

18.     As CEO of B&W Solar, had frequent discussions with the B&W Management Team, and also met formally with the B&W Management Team on a monthly basis in "PAR" (Project Assessment of Risks) meetings during which I presented updates, status, and project assessments related the B&W Solar business, including the New York Solar Projects.

19.     In connection with discussing the New York Solar Projects, B&W Management Team openly discussed not paying subcontractors for their work on the New York Solar Projects as a way to recover losses arising from B&W Enterprises' purchase of Fosler that included the Prime Contracts and the New York Solar Projects.

20.     At a PAR meeting with the B&W Management Team in February or March 2023, I raised concerns regarding B&W Solar's inability to pay for the subcontractors' work on the New York Solar Project. Mr. Frymyer of the B&W Management Team advised that the subcontractors should be directed to perform the work even though they may not be paid for it. Mr. Frymyer noted that many of the subcontractors were directed and agreed to perform work without a written contract or written change order from B&W Solar. I specifically recall

Mr. Frymyer stating that we should direct the subcontractors to do the work, but, when it came to payment, "the hell with them" because they do not have a written agreement.

21.     I also recall a meeting with the B&W Management Team where they specifically discussed monies owed by B&W Solar to Whitford. Although the B&W Management Team knew that Whitford's work was done as directed, and monies were due and owing, the B&W Management Team "dribbled" Whitford money sufficient to keep them working. With regard to Whitford's inquiries regarding payment, I specifically recall Mr. Morgan of the B&W Management Team stating that Whitford does not have a written agreement and can "pound sand."

22.     I also recall that in a private conversation with Mr. Salamone of the B&W Management Team concerning transferring funds between B&W Solar and B&W Enterprises, and the use of funds received for one project to pay expenses for a separate projects. I advised that based on my decades of experience in construction, it was my understanding that it was improper to commingle funds between projects, including that it was improper for B&W Enterprises to take monies received by B&W Solar for one project and apply them to a separate project. I was asked to leave B&W Solar's employ shortly after that discussion with Mr. Salamone. I left B&W Solar's employ in August 2023.

I swear under penalty of perjury that the foregoing is true and correct.

JAMES JACKSON

Sworn to before me this
27 day of 03, 2024

Notary Public

12/18/2027

STATE OF NEW YORK
SUPREME COURT : ST. LAWRENCE COUNTY

———————————————————————

THE L.C. WHITFORD CO., INC.

                                  Plaintiff,

      v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
F/K/A FOSLER CONSTRUCTION COMPANY, INC.,
et al.

                            Defendants.

———————————————————————

Index No. EFCV-24-165764

IAS No. 44-1-2024-0148

**Hon. Mary M. Farley, J.S.C**

Motion Nos. 1, 2, 3

———————————————————————————————————————

## AFFIDAVIT OF JAMES JACKSON

———————————————————————————————————————

## AFFIDAVIT OF JAMES JACKSON

STATE OF ALABAMA    )
                             ) ss.:
COUNTY OF SHELBY      )

        JAMES JACKSON, being duly sworn, deposes and says:

### I.    Background

      1.    I have over 30 years of experience in the construction and energy sectors, and specialize in utility-scale solar power and renewables.

      2.    I was previously the Chief Executive Officer ("CEO") of Babcock & Wilcox Solar Energy, Inc. f/k/a Fosler Construction Company, Inc.

      3.    Before I joined Fosler Construction Company Inc. ("Fosler"), Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased an ownership stake in Fosler.

      4.    I joined Fosler as its Chief Operating Officer ("COO") in February 2022.  At that time, Fosler was partially owned by Paul Fosler ("Mr. Fosler"), and Mr. Fosler was its President and CEO.

      5.    B&W Enterprises thereafter acquired the remaining ownership interests in Fosler from Mr. Fosler.

      6.    After B&W Enterprises purchased the remaining ownership interests in Fosler, Mr. Fosler left the company and I became CEO of Fosler.

      7.    In or around October of 2022, B&W Enterprises changed Fosler's name to Babcock & Wilcox Solar Energy, Inc. ("B&W Solar").  I remained CEO of B&W Solar after the name change.

Case 5:24-cv-00810-GEF   Doc #: 1-1 Filed: 05/22/24   31 of 56 . PageID #: 58

8.      Although I was B&W Solar's CEO in name, I had no control over B&W
Solar's business operation and had no independent authority to make financial decisions or
take financial action on behalf of B&W Solar.  In fact, no B&W Solar employee had the
authority to make economic decisions or take financial actions on behalf of B&W Solar
without consent and approval from the B&W Enterprises.

9.      In particular, the following B&W Enterprises' executives and employees
controlled B&W Solar's business operations, actions, and decisions:

   a. Kenneth Young, Chief Executive Officer of B&W Enterprises;

   b. Louis Salamone, Executive Vice President, Chief Financial Officer, and
    Chief Accounting Officer of B&W Enterprises;

   c. Jimmy Morgan, Chief Operating Officer of B&W Enterprises; and

   d. Cameron Frymyer, Controller and Vice President of Finance of B&W
    Enterprises.

(Collectively, the "B&W Enterprises Management Team").

10.     B&W Enterprises, through the B&W Enterprises Management Team,
controlled all B&W Solar's business decisions and actions, including all B&W Solar's
financial decisions, bank accounts and assets, monetary transfers, what third parties should be
paid by B&W Solar, when they should be paid, and how much they should be paid.

11.     Neither I as CEO of B&W Solar, nor B&W Solar as an entity, could take
business or operational action without authorization from B&W Enterprises acting through
the B&W Management Team.

FILED: ST. LAWRENCE COUNTY CLERK 04/24/2024 09:29 PM

NYSCEF DOC. NO. 98

RECEIVED NYSCEF: 04/24/2024

12. I cannot exaggerate how tight the B&W Management Team's grip and control was over B&W Solar's operations and financial decisions. They needed to approve B&W Solar business decisions, financial actions, payments, non-payments, and monetary transfers. Although I was the CEO of B&W Solar, I had no authority over its bank accounts, was not a signatory to its bank accounts, and needed approval and authorization from B&W Enterprises via the B&W Enterprises Management Team to transfer or expend any B&W Solar funds.

13. I reported to and took direction from all four members of the B&W Solar Management Team, but my interaction and work was weighted more toward Mr. Morgan, Mr. Frymyer, and Mr. Salamone. All actions or decisions concerning B&W Solar, however, were discussed collectively between and decided jointly by the B&W Enterprises Management Team. They worked as a tight group and anything discussed with one B&W Enterprises Management Team member was quickly shared with and known to all members.

14. B&W Solar was undercapitalized to meet its financial obligations and relied on influxes of capital from B&W Enterprises to operate. It is my understanding that B&W Enterprises commingled and transferred the funds of and between B&W Solar, B&W Enterprises, and other B&W entities without distinction based on the decisions and needs of the B&W Enterprises Management Team.

15. In sum, B&W Enterprises and the B&W Enterprises Management Team treated B&W Solar as a part of B&W Enterprises, not as a separate entity, and fully controlled and dominated B&W Solar, including controlling B&W Solar's assets, finances, monetary transfers, and payments.

## II.     The New York Solar Farm Projects

16.     Prior to the sale of Fosler to B&W Enterprises, Fosler, as General Contractor, entered agreements contracts (the "Prime Contracts") with single-purpose entities created and owned by Green Street Power Partners LLC, as Owner, to perform solar farm construction projects in New York (collectively, the "New York Solar Projects").

17.     Fosler and B&W Solar, as General Contractor, subcontracted and directed subcontractors to perform the work on the New York Solar Farm Projects, including subcontractors The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

18.     As CEO of B&W Solar, had frequent discussions with the B&W Management Team, and also met formally with the B&W Management Team on a monthly basis in "PAR" (Project Assessment of Risks) meetings during which I presented updates, status, and project assessments related the B&W Solar business, including the New York Solar Projects.

19.     In connection with discussing the New York Solar Projects, B&W Management Team openly discussed not paying subcontractors for their work on the New York Solar Projects as a way to recover losses arising from B&W Enterprises' purchase of Fosler that included the Prime Contracts and the New York Solar Projects.

20.     At a PAR meeting with the B&W Management Team in February or March 2023, I raised concerns regarding B&W Solar's inability to pay for the subcontractors' work on the New York Solar Project. Mr. Frymyer of the B&W Management Team advised that the subcontractors should be directed to perform the work even though they may not be paid for it. Mr. Frymyer noted that many of the subcontractors were directed and agreed to perform work without a written contract or written change order from B&W Solar. I specifically recall

Mr. Frymyer stating that we should direct the subcontractors to do the work, but, when it came to payment, "the hell with them" because they do not have a written agreement.

21.     I also recall a meeting with the B&W Management Team where they specifically discussed monies owed by B&W Solar to Whitford. Although the B&W Management Team knew that Whitford's work was done as directed, and monies were due and owing, the B&W Management Team "dribbled" Whitford money sufficient to keep them working. With regard to Whitford's inquiries regarding payment, I specifically recall Mr. Morgan of the B&W Management Team stating that Whitford does not have a written agreement and can "pound sand."

22.     I also recall that in a private conversation with Mr. Salamone of the B&W Management Team concerning transferring funds between B&W Solar and B&W Enterprises, and the use of funds received for one project to pay expenses for a separate projects. I advised that based on my decades of experience in construction, it was my understanding that it was improper to commingle funds between projects, including that it was improper for B&W Enterprises to take monies received by B&W Solar for one project and apply them to a separate project. I was asked to leave B&W Solar's employ shortly after that discussion with Mr. Salamone. I left B&W Solar's employ in August 2023.

I swear under penalty of perjury that the foregoing is true and correct.

JAMES JACKSON

Sworn to before me this
27 day of 03, 2024

Notary Public

12/18/2027

STATE OF NEW YORK
SUPREME COURT : ST. LAWRENCE COUNTY

---

THE L.C. WHITFORD CO., INC., et al

                               Plaintiffs,

     v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
F/K/A FOSLER CONSTRUCTION COMPANY, INC.,
et al.

                            Defendants.

---

Index No. EFCV-24-165887

IAS No. 44-1-2024-0195

**Hon. Mary M. Farley, J.S.C**

Motion No. 1 and 2

---

### AFFIDAVIT OF JAMES JACKSON

---

## AFFIDAVIT OF JAMES JACKSON

STATE OF ALABAMA    )
                               ) ss.:
COUNTY OF SHELBY    )

       JAMES JACKSON, being duly sworn, deposes and says:

### I.    Background

    1.    I have over 30 years of experience in the construction and energy sectors, and specialize in utility-scale solar power and renewables.

    2.    I was previously the Chief Executive Officer ("CEO") of Babcock & Wilcox Solar Energy, Inc. f/k/a Fosler Construction Company, Inc.

    3.    Before I joined Fosler Construction Company Inc. ("Fosler"), Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased an ownership stake in Fosler.

    4.    I joined Fosler as its Chief Operating Officer ("COO") in February 2022. At that time, Fosler was partially owned by Paul Fosler ("Mr. Fosler"), and Mr. Fosler was its President and CEO.

    5.    B&W Enterprises thereafter acquired the remaining ownership interests in Fosler from Mr. Fosler.

    6.    After B&W Enterprises purchased the remaining ownership interests in Fosler, Mr. Fosler left the company and I became CEO of Fosler.

    7.    In or around October of 2022, B&W Enterprises changed Fosler's name to Babcock & Wilcox Solar Energy, Inc. ("B&W Solar"). I remained CEO of B&W Solar after the name change.

8.      Although I was B&W Solar's CEO in name, I had no control over B&W Solar's business operation and had no independent authority to make financial decisions or take financial action on behalf of B&W Solar.  In fact, no B&W Solar employee had the authority to make economic decisions or take financial actions on behalf of B&W Solar without consent and approval from the B&W Enterprises.

9.      In particular, the following B&W Enterprises' executives and employees controlled B&W Solar's business operations, actions, and decisions:

a.   Kenneth Young, Chief Executive Officer of B&W Enterprises;

b.   Louis Salamone, Executive Vice President, Chief Financial Officer, and Chief Accounting Officer of B&W Enterprises;

c.   Jimmy Morgan, Chief Operating Officer of B&W Enterprises; and

d.   Cameron Frymyer, Controller and Vice President of Finance of B&W Enterprises.

(Collectively, the "B&W Enterprises Management Team").

10.     B&W Enterprises, through the B&W Enterprises Management Team, controlled all B&W Solar's business decisions and actions, including all B&W Solar's financial decisions, bank accounts and assets, monetary transfers, what third parties should be paid by B&W Solar, when they should be paid, and how much they should be paid.

11.     Neither I as CEO of B&W Solar, nor B&W Solar as an entity, could take business or operational action without authorization from B&W Enterprises acting through the B&W Management Team.

12.     I cannot exaggerate how tight the B&W Management Team's grip and control was over B&W Solar's operations and financial decisions. They needed to approve B&W Solar business decisions, financial actions, payments, non-payments, and monetary transfers. Although I was the CEO of B&W Solar, I had no authority over its bank accounts, was not a signatory to its bank accounts, and needed approval and authorization from B&W Enterprises via the B&W Enterprises Management Team to transfer or expend any B&W Solar funds.

13.     I reported to and took direction from all four members of the B&W Solar Management Team, but my interaction and work was weighted more toward Mr. Morgan, Mr. Frymyer, and Mr. Salamone. All actions or decisions concerning B&W Solar, however, were discussed collectively between and decided jointly by the B&W Enterprises Management Team. They worked as a tight group and anything discussed with one B&W Enterprises Management Team member was quickly shared with and known to all members.

14.     B&W Solar was undercapitalized to meet its financial obligations and relied on influxes of capital from B&W Enterprises to operate. It is my understanding that B&W Enterprises commingled and transferred the funds of and between B&W Solar, B&W Enterprises, and other B&W entities without distinction based on the decisions and needs of the B&W Enterprises Management Team.

15.     In sum, B&W Enterprises and the B&W Enterprises Management Team treated B&W Solar as a part of B&W Enterprises, not as a separate entity, and fully controlled and dominated B&W Solar, including controlling B&W Solar's assets, finances, monetary transfers, and payments.

## II.     The New York Solar Farm Projects

16.     Prior to the sale of Fosler to B&W Enterprises, Fosler, as General Contractor, entered agreements contracts (the "Prime Contracts") with single-purpose entities created and owned by Green Street Power Partners LLC, as Owner, to perform solar farm construction projects in New York (collectively, the "New York Solar Projects").

17.     Fosler and B&W Solar, as General Contractor, subcontracted and directed subcontractors to perform the work on the New York Solar Farm Projects, including subcontractors The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

18.     As CEO of B&W Solar, had frequent discussions with the B&W Management Team, and also met formally with the B&W Management Team on a monthly basis in "PAR" (Project Assessment of Risks) meetings during which I presented updates, status, and project assessments related the B&W Solar business, including the New York Solar Projects.

19.     In connection with discussing the New York Solar Projects, B&W Management Team openly discussed not paying subcontractors for their work on the New York Solar Projects as a way to recover losses arising from B&W Enterprises' purchase of Fosler that included the Prime Contracts and the New York Solar Projects.

20.     At a PAR meeting with the B&W Management Team in February or March 2023, I raised concerns regarding B&W Solar's inability to pay for the subcontractors' work on the New York Solar Project. Mr. Frymyer of the B&W Management Team advised that the subcontractors should be directed to perform the work even though they may not be paid for it. Mr. Frymyer noted that many of the subcontractors were directed and agreed to perform work without a written contract or written change order from B&W Solar. I specifically recall

Mr. Frymyer stating that we should direct the subcontractors to do the work, but, when it came to payment, "the hell with them" because they do not have a written agreement.

21.     I also recall a meeting with the B&W Management Team where they specifically discussed monies owed by B&W Solar to Whitford. Although the B&W Management Team knew that Whitford's work was done as directed, and monies were due and owing, the B&W Management Team "dribbled" Whitford money sufficient to keep them working. With regard to Whitford's inquiries regarding payment, I specifically recall Mr. Morgan of the B&W Management Team stating that Whitford does not have a written agreement and can "pound sand."

22.     I also recall that in a private conversation with Mr. Salamone of the B&W Management Team concerning transferring funds between B&W Solar and B&W Enterprises, and the use of funds received for one project to pay expenses for a separate projects. I advised that based on my decades of experience in construction, it was my understanding that it was improper to commingle funds between projects, including that it was improper for B&W Enterprises to take monies received by B&W Solar for one project and apply them to a separate project. I was asked to leave B&W Solar's employ shortly after that discussion with Mr. Salamone. I left B&W Solar's employ in August 2023.

I swear under penalty of perjury that the foregoing is true and correct.

JAMES JACKSON

Sworn to before me this
27 day of 03, 2024

Notary Public

12/18/2027

STATE OF NEW YORK
SUPREME COURT : ST. LAWRENCE COUNTY

————————————————————————

THE L.C. WHITFORD CO., INC., et al.

                                   Plaintiffs,

        v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
F/K/A FOSLER CONSTRUCTION COMPANY, INC.,
BABCOCK & WILCOX ENTERPRISES, INC., et al.

                                   Defendants.

————————————————————————

Index No. EFCV-24-165710

IAS No. 44-1-2024-0042

**Hon. Mary M. Farley, J.S.C**

Motion Nos. 2 and 3

————————————————————————————————————————

## AFFIDAVIT OF COLLIN RHODES

————————————————————————————————————————

**EXHIBIT**

tabbies®

**F**

## AFFIDAVIT OF COLLIN RHODES

STATE OF NEW MEXICO  )
                              ) ss.:
COUNTY OF SANTA FE   )

           COLLIN RHODES, being duly sworn, deposes and says:

1.      I joined Fosler Construction Company Inc. ("Fosler") as Director of Construction in October 2021.

2.      Several weeks before I joined Fosler, Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased a controlling ownership interest in Fosler.

3.      B&W Enterprises ultimately purchased the remaining ownership interests in Fosler and renamed the company Babcock & Wilcox Solar Energy, Inc. ("B&W Solar").

4.      In January 2023, Jimmy Morgan, COO of B&W Enterprises, promoted me to Chief Engineer of B&W Solar.

5.      There was no operational distinction between B&W Solar and B&W Enterprises. B&W Enterprises controlled all of the business decisions and operations of B&W Solar. All actions of consequence concerning B&W Solar's business required approval from a group of individuals referred to as the "B&W Board" consisting of Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer, all of whom were executives and employees of B&W Enterprises. By way of example, I could not submit an estimate or project bid on behalf of B&W Solar without approval from the B&W Board.

6.      I primarily focused on the B&W's solar projects, including various solar farm projects in New York state that B&W Solar was performing for Green Street Power Partners.

7.    B&W engaged various subcontractors to perform the New York solar farm projects, including The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

8.    B&W Solar failed to pay subcontractors on the New York solar projects for requested, completed, and accepted work.

9.    In or about January 23, 2023, I attended a meeting with B&W Enterprises' executives at a hotel conference center in Fort Mill, South Carolina, which was not far from B&W's offices in Charlotte, North Carolina. Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer—the B&W Board—were in attendance, as well as James Jackson, the CEO of B&W Solar at that time. In response to my inquiries about monies due and owing to Whitford, Mr. Frymyer stated, "string LC Whitford along and get them to complete as much as possible; when they realize that we are not going to pay they can bring us to court." Mr. Morgan agreed and stated, "we have more lawyers than they do." Mr. Salamone and Mr. Young also agreed. I attempted to object and Mr. Salamone told me that "I better get in line if I want to keep my job." I distinctly remember this exchange because I was shocked and appalled.

10.    In or about the end of the First Quarter or the beginning of the Second Quarter of 2023, the B&W Board tasked me with reviewing and auditing Whitford's submitted and outstanding invoices and backup information for the New York solar projects. Based on my recollection, at the time of my review, Whitford had more than approximately $2.5M in unpaid invoices outstanding. At that time, based on my recollection, B&W also knew and understood that Whitford also had more than approximately $2.5M in additional invoices for requested work that had not yet been submitted.

11.     After my review of the Whitford invoices and documentation in B&W's
possession, I issued a report to the B&W Board advising that I located work requests,
receipts, and other validating documentation to corroborate that more than 90% of the
outstanding invoice amounts should be paid. The B&W Board, however, did not pay the
undisputed amounts.

12.     Whitford was not the only subcontractor that B&W Board directed do work
knowing that it ultimately would not provide payment for such work. Rather, the B&W
Board systematically attempted to induce subcontractors to perform work with the intent not
to make payment as a cost-cutting measure.

13.     I ultimately left B&W Solar's employee in November 2023. This was shortly
after B&W Enterprises announced that it was putting B&W Solar up for sale. Tony Dorazio
told me that my position was being terminated as part of a restructuring.

I swear under penalty of perjury that the foregoing is true and correct.

COLLIN RHODES

Sworn to before me this
17th day of April, 2024

Notary Public

RICHARD OWENS PUGH JR
Notary Public - State of New Mexico
Commission # 1137449
My Comm. Expires Feb 10, 2026

3

FILED: LEWIS COUNTY CLERK 05/09/2024 09:58 AM     Case 5:24-cv-00108-GTS-TWD   Document 1-2   Filed 05/22/24   45 of 56.   PageID #: 72   INDEX NO. EFCA2024-000085

NYSCEF DOC. NO. 57                                                                                                              RECEIVED NYSCEF: 05/09/2024

STATE OF NEW YORK
SUPREME COURT : COUNTY OF LEWIS

---

SMOKE RIVER, LLC,

                              Plaintiff,

      v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
f/k/a FOSLER CONSTRUCTION COMPANY, INC.,
et al.

                           Defendants.

---

Index No. EFCA2024-000085

**Hon. Charles C. Merrell, J.S.C.**

Motion Nos. 1 and 2

---

## AFFIDAVIT OF COLLIN RHODES

---

## AFFIDAVIT OF COLLIN RHODES

STATE OF NEW MEXICO  )
                              ) ss.:
COUNTY OF SANTA FE    )

        COLLIN RHODES, being duly sworn, deposes and says:

1.      I joined Fosler Construction Company Inc. ("Fosler") as Director of Construction in October 2021.

2.      Several weeks before I joined Fosler, Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased a controlling ownership interest in Fosler.

3.      B&W Enterprises ultimately purchased the remaining ownership interests in Fosler and renamed the company Babcock & Wilcox Solar Energy, Inc. ("B&W Solar").

4.      In January 2023, Jimmy Morgan, COO of B&W Enterprises, promoted me to Chief Engineer of B&W Solar.

5.      There was no operational distinction between B&W Solar and B&W Enterprises. B&W Enterprises controlled all of the business decisions and operations of B&W Solar. All actions of consequence concerning B&W Solar's business required approval from a group of individuals referred to as the "B&W Board" consisting of Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer, all of whom were executives and employees of B&W Enterprises. By way of example, I could not submit an estimate or project bid on behalf of B&W Solar without approval from the B&W Board.

6.      I primarily focused on the B&W's solar projects, including various solar farm projects in New York state that B&W Solar was performing for Green Street Power Partners.

7.      B&W engaged various subcontractors to perform the New York solar farm projects, including The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

8.      B&W Solar failed to pay subcontractors on the New York solar projects for requested, completed, and accepted work.

9.      In or about January 23, 2023, I attended a meeting with B&W Enterprises' executives at a hotel conference center in Fort Mill, South Carolina, which was not far from B&W's offices in Charlotte, North Carolina.  Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer—the B&W Board—were in attendance, as well as James Jackson, the CEO of B&W Solar at that time.  In response to my inquiries about monies due and owing to Whitford, Mr. Frymyer stated, "string LC Whitford along and get them to complete as much as possible; when they realize that we are not going to pay they can bring us to court."  Mr. Morgan agreed and stated, "we have more lawyers than they do."  Mr. Salamone and Mr. Young also agreed.  I attempted to object and Mr. Salamone told me that "I better get in line if I want to keep my job." I distinctly remember this exchange because I was shocked and appalled.

10.      In or about the end of the First Quarter or the beginning of the Second Quarter of 2023, the B&W Board tasked me with reviewing and auditing Whitford's submitted and outstanding invoices and backup information for the New York solar projects.  Based on my recollection, at the time of my review, Whitford had more than approximately $2.5M in unpaid invoices outstanding.  At that time, based on my recollection, B&W also knew and understood that Whitford also had more than approximately $2.5M in additional invoices for requested work that had not yet been submitted.

11.     After my review of the Whitford invoices and documentation in B&W's possession, I issued a report to the B&W Board advising that I located work requests, receipts, and other validating documentation to corroborate that more than 90% of the outstanding invoice amounts should be paid. The B&W Board, however, did not pay the **undisputed amounts**.

12.     Whitford was not the only subcontractor that B&W Board directed do work knowing that it ultimately would not provide payment for such work. Rather, the B&W Board systematically attempted to induce subcontractors to perform work with the intent not to make payment as a cost-cutting measure.

13.     I ultimately left B&W Solar's employee in November 2023. This was shortly after B&W Enterprises announced that it was putting B&W Solar up for sale. Tony Dorazio told me that my position was being terminated as part of a restructuring.

I swear under penalty of perjury that the foregoing is true and correct.

_____
COLLIN RHODES

Sworn to before me this
17ᵗʰ day of April, 2024

_____
Notary Public

RICHARD OWENS PUGH JR
Notary Public - State of New Mexico
Commission # 1137449
My Comm. Expires Feb 10, 2026

3

STATE OF NEW YORK
SUPREME COURT : ST. LAWRENCE COUNTY

———————————————————————

THE L.C. WHITFORD CO., INC.

                                Plaintiff,

       v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
F/K/A FOSLER CONSTRUCTION COMPANY, INC.,
et al.

                             Defendants.

———————————————————————

Index No. EFCV-24-165764

IAS No. 44-1-2024-0148

**Hon. Mary M. Farley, J.S.C**

Motion Nos. 1, 2, 3

---

## AFFIDAVIT OF COLLIN RHODES

---

## AFFIDAVIT OF COLLIN RHODES

STATE OF NEW MEXICO  )
                                 ) ss.:
COUNTY OF SANTA FE   )

COLLIN RHODES, being duly sworn, deposes and says:

1. I joined Fosler Construction Company Inc. ("Fosler") as Director of Construction in October 2021.

2. Several weeks before I joined Fosler, Babcock & Wilcox Enterprises, Inc. ("B&W Enterprises") purchased a controlling ownership interest in Fosler.

3. B&W Enterprises ultimately purchased the remaining ownership interests in Fosler and renamed the company Babcock & Wilcox Solar Energy, Inc. ("B&W Solar").

4. In January 2023, Jimmy Morgan, COO of B&W Enterprises, promoted me to Chief Engineer of B&W Solar.

5. There was no operational distinction between B&W Solar and B&W Enterprises. B&W Enterprises controlled all of the business decisions and operations of B&W Solar. All actions of consequence concerning B&W Solar's business required approval from a group of individuals referred to as the "B&W Board" consisting of Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer, all of whom were executives and employees of B&W Enterprises. By way of example, I could not submit an estimate or project bid on behalf of B&W Solar without approval from the B&W Board.

6. I primarily focused on the B&W's solar projects, including various solar farm projects in New York state that B&W Solar was performing for Green Street Power Partners.

7.      B&W engaged various subcontractors to perform the New York solar farm projects, including The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

8.      B&W Solar failed to pay subcontractors on the New York solar projects for requested, completed, and accepted work.

9.      In or about January 23, 2023, I attended a meeting with B&W Enterprises' executives at a hotel conference center in Fort Mill, South Carolina, which was not far from B&W's offices in Charlotte, North Carolina.  Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer—the B&W Board—were in attendance, as well as James Jackson, the CEO of B&W Solar at that time.  In response to my inquiries about monies due and owing to Whitford, Mr. Frymyer stated, "string LC Whitford along and get them to complete as much as possible; when they realize that we are not going to pay they can bring us to court."  Mr. Morgan agreed and stated, "we have more lawyers than they do."  Mr. Salamone and Mr. Young also agreed.  I attempted to object and Mr. Salamone told me that "I better get in line if I want to keep my job." I distinctly remember this exchange because I was shocked and appalled.

10.     In or about the end of the First Quarter or the beginning of the Second Quarter of 2023, the B&W Board tasked me with reviewing and auditing Whitford's submitted and outstanding invoices and backup information for the New York solar projects.  Based on my recollection, at the time of my review, Whitford had more than approximately $2.5M in unpaid invoices outstanding.  At that time, based on my recollection, B&W also knew and understood that Whitford also had more than approximately $2.5M in additional invoices for requested work that had not yet been submitted.

11.     After my review of the Whitford invoices and documentation in B&W's
possession, I issued a report to the B&W Board advising that I located work requests,
receipts, and other validating documentation to corroborate that more than 90% of the
outstanding invoice amounts should be paid. The B&W Board, however, did not pay the
undisputed amounts.

12.     Whitford was not the only subcontractor that B&W Board directed do work
knowing that it ultimately would not provide payment for such work. Rather, the B&W
Board systematically attempted to induce subcontractors to perform work with the intent not
to make payment as a cost-cutting measure.

13.     I ultimately left B&W Solar's employee in November 2023. This was shortly
after B&W Enterprises announced that it was putting B&W Solar up for sale. Tony Dorazio
told me that my position was being terminated as part of a restructuring.

I swear under penalty of perjury that the foregoing is true and correct.

_____

COLLIN RHODES

Sworn to before me this
_17th_ day of April, 2024

_____
Notary Public

RICHARD OWENS PUGH JR
Notary Public - State of New Mexico
Commission # 1137449
My Comm. Expires Feb 10, 2026

3

STATE OF NEW YORK
SUPREME COURT : ST. LAWRENCE COUNTY

---

THE L.C. WHITFORD CO., INC., et al

                              Plaintiffs,

        v.

BABCOCK & WILCOX SOLAR ENERGY, INC.
F/K/A FOSLER CONSTRUCTION COMPANY, INC.,
et al.

                              Defendants.

---

Index No. EFCV-24-165887

IAS No. 44-1-2024-0195

**Hon. Mary M. Farley, J.S.C**

Motion No. 1 and 2

---

## AFFIDAVIT OF COLLIN RHODES

---

# AFFIDAVIT OF COLLIN RHODES

STATE OF NEW MEXICO   )
                      )  ss.:
COUNTY OF SANTA FE    )

COLLIN RHODES, being duly sworn, deposes and says:

1.      I joined Fosler Construction Company Inc. ("Fosler") as Director of
Construction in October 2021.

2.      Several weeks before I joined Fosler, Babcock & Wilcox Enterprises, Inc.
("B&W Enterprises") purchased a controlling ownership interest in Fosler.

3.      B&W Enterprises ultimately purchased the remaining ownership interests in
Fosler and renamed the company Babcock & Wilcox Solar Energy, Inc. ("B&W Solar").

4.      In January 2023, Jimmy Morgan, COO of B&W Enterprises, promoted me to
Chief Engineer of B&W Solar.

5.      There was no operational distinction between B&W Solar and B&W
Enterprises.  B&W Enterprises controlled all of the business decisions and operations of
B&W Solar.  All actions of consequence concerning B&W Solar's business required
approval from a group of individuals referred to as the "B&W Board" consisting of Kenny
Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer, all of whom were executives
and employees of B&W Enterprises.  By way of example, I could not submit an estimate or
project bid on behalf of B&W Solar without approval from the B&W Board.

6.      I primarily focused on the B&W's solar projects, including various solar farm
projects in New York state that B&W Solar was performing for Green Street Power Partners.

7.     B&W engaged various subcontractors to perform the New York solar farm projects, including The L.C. Whitford Co., Inc. ("Whitford"), Greyco Personnel Services, LLC ("Greyco"), and Smoke River, LLC ("Smoke River").

8.     B&W Solar failed to pay subcontractors on the New York solar projects for requested, completed, and accepted work.

9.     In or about January 23, 2023, I attended a meeting with B&W Enterprises' executives at a hotel conference center in Fort Mill, South Carolina, which was not far from B&W's offices in Charlotte, North Carolina. Kenny Young, Lou Salamone, Jimmy Morgan, and Cameron Frymyer—the B&W Board—were in attendance, as well as James Jackson, the CEO of B&W Solar at that time. In response to my inquiries about monies due and owing to Whitford, Mr. Frymyer stated, "string LC Whitford along and get them to complete as much as possible; when they realize that we are not going to pay they can bring us to court." Mr. Morgan agreed and stated, "we have more lawyers than they do." Mr. Salamone and Mr. Young also agreed. I attempted to object and Mr. Salamone told me that "I better get in line if I want to keep my job." I distinctly remember this exchange because I was shocked and appalled.

10.    In or about the end of the First Quarter or the beginning of the Second Quarter of 2023, the B&W Board tasked me with reviewing and auditing Whitford's submitted and outstanding invoices and backup information for the New York solar projects. Based on my recollection, at the time of my review, Whitford had more than approximately $2.5M in unpaid invoices outstanding. At that time, based on my recollection, B&W also knew and understood that Whitford also had more than approximately $2.5M in additional invoices for requested work that had not yet been submitted.

11.     After my review of the Whitford invoices and documentation in B&W's

possession, I issued a report to the B&W Board advising that I located work requests,

receipts, and other validating documentation to corroborate that more than 90% of the

outstanding invoice amounts should be paid.  The B&W Board, however, did not pay the

undisputed amounts.

12.     Whitford was not the only subcontractor that B&W Board directed do work

knowing that it ultimately would not provide payment for such work. Rather, the B&W

Board systematically attempted to induce subcontractors to perform work with the intent not

to make payment as a cost-cutting measure.

13.     I ultimately left B&W Solar's employee in November 2023.  This was shortly

after B&W Enterprises announced that it was putting B&W Solar up for sale. Tony Dorazio

told me that my position was being terminated as part of a restructuring.

I swear under penalty of perjury that the foregoing is true and correct.

COLLIN RHODES

Sworn to before me this
17ᵗʰ day of April, 2024

Notary Public

RICHARD OWENS PUGH JR
Notary Public - State of New Mexico
Commission # 1137449
My Comm. Expires Feb 10, 2026

3